IN the INTEREST OF DOUGLAS D., a person Under the Age of 17:

STATE of Wisconsin, Petitioner-Respondent,

v.

DOUGLAS D., Respondent-Appellant-Petitioner.†

Supreme Court

No. 99–1767–FT. *Oral argument October 3, 2000.—Decided May 16, 2001.*

2001 WI 47

(Also reported in 626 N.W.2d 725.)

†Motion for reconsideration denied June 28, 2001.

For the respondent-appellant-petitioner there were briefs and oral argument by *Eileen A. Hirsch*, assistant state public defender.

For the petitioner-respondent the cause was argued by *Jeffrey J. Kassel*, assistant attorney general, with whom on the briefs was *James E. Doyle*, attorney general.

An amicus curiae brief was filed by *Carol W. Medaris* and *Wisconsin Council on Children & Families,* Madison, *Adam Culbreath* and *National Center for Youth Law*, Oakland, California, and *Laval S. Miller-Wilson* and *Juvenile Law Center*, Philadelphia, Pennsylvania, on behalf of the Juvenile Law Center and National Center for Youth Law.

An amicus curiae brief was filed by *Jon G. Furlow, Christine Cooney Mansour* and *Michael Best & Friedrich LLP*, Madison, on behalf of the American Civil Liberties Union of Wisconsin, Inc.

¶ 1.   JON P. WILCOX, J.   This is a review of a court of appeals decision, *In the Interest of Douglas D.: State v. Douglas D.*, No. 99–1767–FT, unpublished slip op. (Wis. Ct. App. Dec. 14, 1999), which affirmed a judgment by the Circuit Court for Oconto County, Judge Richard D. Delforge. The circuit court found that

the content of an eighth-grade creative writing assignment authored by the petitioner, Douglas D. (Douglas), a minor, constituted a threat against Douglas's English teacher. Based on this finding, the court adjudicated Douglas delinquent for violating the disorderly conduct statute, Wis. Stat. § 947.01 (1997–98).[1]

¶ 2.    Douglas now petitions this court to reverse the court of appeals decision, which affirmed his delinquency adjudication. In doing so, he presents two issues for review: (1) Can the disorderly conduct statute be construed to criminalize purely written speech, even if the speech does not cause a disturbance? (2) If so, is his speech protected by the First Amendment,[2]

---

[1] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

[2] Douglas actually challenges the court of appeals decision on this issue under both the First Amendment of the United States Constitution and Article I, Section 3 of the Wisconsin Constitution. The First Amendment of the United States Constitution, applicable to the states under the Due Process Clause of the Fourteenth Amendment, provides in pertinent part that "Congress shall make no law. . .abridging the freedom of speech." *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 489 n.1 (1996). Article I, Section 3 of the Wisconsin Constitution provides in pertinent part that "[e]very person may freely speak, write and publish his [or her] sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press." Despite the differences in language between these provisions, we have found no differences in the freedoms that they guarantee. *County of Kenosha v. C & S Mgmt., Inc.,* 223 Wis. 2d 373, 388, 588 N.W.2d 236 (1999). For this reason, and due to the lack of Wisconsin caselaw applying Article I, Section 3 to facts similar to those at issue, we rely exclusively upon First Amendment precedent in this opinion. However, all such precedent

thus barring the State from prosecuting him for disorderly conduct?

¶ 3.   We conclude that purely written speech, even written speech that fails to cause an actual disturbance, can constitute disorderly conduct as defined by § 947.01; however, because Douglas's speech falls within the protection of the First Amendment, the State nonetheless is barred from prosecuting Douglas for disorderly conduct. Accordingly, we reverse the decision of the court of appeals.

I

¶ 4.   This case arises from events that occurred while Douglas was an eighth-grade student at an Oconto County public school. On October 7, 1998, Douglas's English teacher, who commonly referred to herself in class as "Mrs. C," gave Douglas a creative writing assignment to complete during class. Mrs. C instructed Douglas to begin writing a story, which later would be passed on to a series of three other students, each adding to Douglas's work. But other than entitling the assignment "Top Secret," Mrs. C provided no limit regarding the topic on which Douglas was to write.

¶ 5.   Rather than beginning his assignment, Douglas visited with some friends and disrupted the class. Therefore, Mrs. C sent Douglas into the hall to complete his assignment.

¶ 6.   At the end of the period, Douglas returned to class and handed his work to Mrs. C. A few minutes later, Mrs. C read what Douglas had written:

and the conclusions that we draw therefrom apply with equal force to Article I, Section 3.

There one lived an old ugly woman her name was Mrs. C that stood for crab. She was a mean old woman that would beat children sencless. I guess that's why she became a teacher.

Well one day she kick a student out of her class & he din't like it. That student was named Dick.

The next morning Dick came to class & in his coat he conseled a machedy. When the teacher told him to shut up he whiped it out & cut her head off.

When the sub came 2 days later she needed a paperclipp so she opened the droor. Ahh she screamed as she found Mrs. C.'s head in the droor.

¶ 7.   Mrs. C believed this story to be a threat that if she disciplined Douglas again, Douglas intended to harm her. As a result, she became frightened and, after dismissing Douglas's class as scheduled, notified the school assistant principal of the incident.

¶ 8.   Upon learning of the incident and observing that Mrs. C was very upset, the assistant principal called Douglas into his office. Douglas apologized for the story, stating that he did not intend it to be interpreted as a threat. The assistant principal then imposed on Douglas an in-school suspension.

¶ 9.   After Douglas served his suspension, the school readmitted him to class—albeit with a different English teacher. However, on November 19, 1998, the police filed a delinquency petition against Douglas, alleging that by submitting a "death threat" to Mrs. C, Douglas had engaged in "abusive conduct under circumstances in which the conduct tends to cause a disturbance," thus violating the disorderly conduct statute, § 947.01.

¶ 10.   On March 11, 1999, the circuit court held a fact-finding hearing regarding the delinquency petition. After hearing testimony from Douglas, Mrs. C, the assistant principal, and an employee of the Oconto

County Department of Human Services, the court explained that pursuant to § 947.01, the petitioner has the burden to prove two elements: (1) the juvenile engaged in abusive "conduct," which can include "either physical acts or language"; and (2) the juvenile's conduct occurred under circumstances that tend to cause a disturbance. Applying this standard to the facts, the court first found that Douglas had communicated a "direct threat" to Mrs. C. This threat, the court concluded, constituted abusive conduct unprotected by the First Amendment. Second, the court found that Douglas's conduct provoked a disturbance: it caused Mrs. C to become upset. Based on these findings, the court ruled that Douglas was guilty of disorderly conduct. Accordingly, it ordered that he be placed on formal supervision for one year.

¶ 11.   Douglas raised two arguments on appeal. First, he argued that the delinquency adjudication based on the content of his school creative writing assignment violates his First Amendment right to free speech. Second, he contended that even if such an adjudication does not violate the First Amendment, § 947.01 criminalizes "conduct" and, therefore, cannot be construed to criminalize purely written speech. For these reasons, Douglas requested that the court of appeals reverse his adjudication.

¶ 12.   The court of appeals rejected Douglas's arguments and affirmed the circuit court ruling. *Douglas D.*, unpublished slip op. Addressing Douglas's first argument, the court explained that "true threats" are among the categories of speech that receive limited or no constitutional protection. *Id.* at 4–5. Further, the court discerned "no material difference in connotation between the phrase[s] 'true threat' and 'direct threat.' " *Id.* at 5 n.5. Thus, deferring to the circuit court's find-

ing that Douglas's story constituted a "direct threat," the court of appeals ruled that the First Amendment does not protect Douglas's speech. *Id.* at 6. Regarding Douglas's second argument, the court held that the term "conduct," as used in § 947.01, applies to "both acts *and* (unprotected) words." *Id.* Hence, the court held that the State properly prosecuted Douglas pursuant to § 947.01 for the content of his story. *Id.* at 7.

¶ 13. Douglas subsequently filed a petition to this court for review of the court of appeals decision. On February 22, 2000, this court granted review.

## II

¶ 14. We first review whether the disorderly conduct statute, § 947.01, can be construed to criminalize purely written speech, even if the speech does not cause a disturbance. This presents an issue of statutory interpretation, which this court reviews de novo. *See Teague v. Bad River Band of the Lake Superior Tribe of Chippewa Indians*, 2000 WI 79, ¶ 17, 236 Wis. 2d 384, 612 N.W.2d 709.

¶ 15. Section 947.01 provides: "Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor." To prosecute a defendant for a violation of this statute, the State has the burden to prove two elements. First, it must prove that the defendant engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct. *See State v. Zwicker*, 41 Wis. 2d 497, 514, 164 N.W.2d 512 (1969). Second, it must prove that the defendant's conduct occurred under circum-

stances where such conduct tends to cause or provoke a disturbance. *Id.* Under both elements, "[i]t is the combination of conduct and circumstances that is crucial in applying the statute to a particular situation." *State v. Maker*, 48 Wis. 2d 612, 616, 180 N.W.2d 707 (1970).

## A

¶ 16.  Douglas first argues that "conduct," as used in § 947.01, does not include speech unless such speech is intertwined with physical action. In support of his argument, Douglas cites *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), and *Zwicker*, 41 Wis. 2d 497, for the general rule that the government cannot regulate the content of speech. He further explains that Wisconsin courts have adhered to this rule. On one hand, Wisconsin courts consistently have struck down legislation that criminalizes speech protected by the First Amendment.[3] On the other hand, there is no published Wisconsin opinion in which a court has upheld a conviction under § 947.01 for speech alone. In light of this precedent, Douglas argues, the State has recognized that it constitutionally is barred from convicting a person based solely on the content of his or her speech.

¶ 17.  We reject this argument. To be sure, "[t]he First Amendment generally prevents government from proscribing speech. . .because of disapproval of the ideas expressed." *R.A.V.*, 505 U.S. at 382. However, "it is well understood that the right of free speech is not absolute at all times and under all circumstances."

---

[3] *See, e.g., City of Milwaukee v. Wroten*, 160 Wis. 2d 207, 466 N.W.2d 861 (1991) (striking down city ordinance, which prohibited hindering or preventing police from discharging duties); *State v. Dronso*, 90 Wis. 2d 110, 279 N.W.2d 710 (Ct. App. 1979) (striking down statute that prohibited intentionally annoying phone calls).

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). Some categories of speech are "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). These categories include: "fighting words," *Chaplinsky*, 315 U.S. 568; speech that incites others into imminent lawless action, *Brandenburg v. Ohio*, 395 U.S. 444 (1969); obscenity, *Miller v. California*, 413 U.S. 15 (1973); libel and defamatory speech, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); and "true threats," *Watts v. United States*, 394 U.S. 705 (1969). As the United States Supreme Court has explained, such speech "constitute[s] 'no *essential* part of any exposition of ideas.' " *R.A.V.*, 505 U.S. at 385 (quoting *Chaplinsky*, 315 U.S. at 572). Despite its verbal character, this speech essentially is a "nonspeech element of communication." *R.A.V.*, 505 U.S. at 386 (quotations omitted). In this sense, it is analogous "to a noisy sound truck: Each is. . .a mode of speech. . .; both can be used to convey an idea; but neither has, in and of itself, a claim upon the First Amendment." *Id.* (citation and quotation omitted). Accordingly, states can regulate, consistent with the First Amendment, these unprotected categories of speech.[4]

¶ 18.   The right to regulate, however, does not give a state unbridled discretion. To survive constitutional scrutiny, a state must narrowly tailor any regulation that limits the content of unprotected speech unaccompanied by conduct.

---

[4] *Cf. Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) (holding that commercial speech is afforded only a "limited measure of protection").

¶ 19. On one hand, the regulation must not be overbroad. The United States Supreme Court addressed this issue in *Gooding v. Wilson*, 405 U.S. 518 (1972), in which it reviewed a Georgia statute that provided in pertinent part: "Any person who shall, without provocation, use to or of another, and in his presence. . .opprobrious words or abusive language, tending to cause a breach of peace. . .shall be guilty of a misdemeanor." *Id.* at 519 (quoting Ga. Code Ann. § 26–6303 (1933)). After examining cases in which the statute had been applied, the Court concluded that the statute had not been limited in application to criminalize only unprotected speech; in some circumstances, the statute had been applied to criminalize protected speech that merely offended its listeners. *Id.* at 524. The Court then explained:

> The constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within narrowly limited classes of speech. Even as to such a class, however, because the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn, in every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. In other words, the statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression.

*Id.* at 521–22 (citations and quotations omitted). Applying this standard, the Court struck down the statute as being unconstitutionally overbroad. *Id.* at 528. In doing so, the Court made clear that state regu-

lation of speech may not be so broad as to criminalize not only unprotected speech, but also speech that enjoys the protection of the First Amendment.

¶ 20.   On the other hand, the regulation must not be "underbroad." The United States Supreme Court addressed this concern in *R.A.V.*, 505 U.S. 377. In that case, the Court analyzed a St. Paul, Minnesota ordinance, which banned persons from:

> plac[ing] on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender.

*Id.* at 380 (quoting St. Paul, Minn., Legis. Code § 292.02 (1990)). As construed by the Minnesota Supreme Court, this ordinance applied only to "fighting words," one category of unprotected speech. *Id.* at 381. However, the ordinance prohibited only one particular type of "fighting words": " 'fighting words' that insult, or provoke violence, 'on the basis of race, color, creed, religion or gender.' " *Id.* at 391. In analyzing this regulation, the Court explained that although the government may regulate, consistent with the First Amendment, certain categories of speech, it may not regulate such speech "based on hostility—or favoritism—towards the underlying message expressed." *Id.* at 386. Because the St. Paul ordinance discriminated against fighting words expressing a particular viewpoint, the Court held that the ordinance was unconstitutionally "underbroad." *Id.* at 391–96; *see also id.* at 401–02 (White, J., concurring in the judg-

ment) (noting that under the Court's "underbreadth" doctrine, states generally must take an all-or-nothing approach to limiting unprotected speech). Thus, as illustrated by this holding, a state generally may not regulate so narrowly as to criminalize only particular viewpoints within a larger proscribable category of speech.[5]

¶ 21.  Turning to the regulation at issue in this case, it is clear that § 947.01, if applied to speech alone, would not suffer from the infirmities that the Supreme Court described in *Gooding* and *R.A.V.*. First, § 947.01 is not overbroad. As this court repeatedly has held, "[t]he language of the disorderly conduct statute is not so broad that its sanctions may apply to conduct protected by the constitution."[6] *Zwicker*, 41 Wis. 2d at 509;

---

[5] In other words, state regulation must be "content-neutral." *See Hill v. Colorado*, 530 U.S. 703, 719–30 (2000).

[6] In her concurring opinion, Chief Justice Abrahamson disputes whether this court can authoritatively construe a potentially facially overbroad statute so as to prevent the statute from being rendered unconstitutional. Concurrence at ¶¶ 53–57. She is correct that " '[a] statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate.' " *State v. Janssen*, 219 Wis. 2d 362, 374, 580 N.W.2d 260 (1998) (quoting *Bachowski v. Salamone*, 139 Wis. 2d 397, 411, 407 N.W.2d 533 (1987)). However, she fails to take notice of the adjunct rule that "[s]tatutes that are challenged as overbroad may be preserved if a limiting and validating construction of the statute's language is readily available." *Id.* at 378; *see also, e.g., Lewis v. City of New Orleans*, 415 U.S. 130, 133–34 (1974) (holding that facially overbroad statutes or ordinances can withstand constitutional attack if they are authoritatively construed by the state supreme court to punish only speech unprotected by the First

*see also State v. Becker*, 51 Wis. 2d 659, 664, 188 N.W.2d 449 (1971) (citing *Zwicker* as holding that "this court rejected the contention that the Wisconsin disorderly conduct statute [i]s so unnecessarily broad as to invade the area of protected freedoms"); *Maker*, 48 Wis. 2d at 615–16 (quoting *Zwicker*). Thus, the statute's sanctions cannot be applied directly to speech protected by the First Amendment. Second, § 947.01 is not underbroad. Section 947.01 prohibits all unprotected speech that is likely to cause "substantial intrusions which offend the normal sensibilities of average persons or which constitute significantly abusive or disturbing demeanor in the eyes of reasonable persons."[7] *Zwicker*, 41 Wis. 2d at 508. It does not proscribe

Amendment); *Gooding v. Wilson*, 405 U.S. 518, 522 (1972) ("the statute must be carefully drawn *or be authoritatively construed* to punish only unprotected speech") (emphasis added); *Cox v. Louisiana*, 379 U.S. 536, 551 (1965) (examining statute "as authoritatively interpreted" by the state supreme court); *Edwards v. South Carolina*, 372 U.S. 229, 238 (1963) (noting that courts must analyze statutes "as authoritatively construed"); *Terminiello v. City of Chicago*, 337 U.S. 1, 4–6 (1949) (noting that the Court considers statutes and ordinances as construed).

Moreover, we cannot discern why she spends the vast majority of her concurrence criticizing the majority's conclusion that § 947.01 can punish only constitutionally unprotected speech, yet she writes in her concurrence to *State v. A.S.* that she is bound by this conclusion. 2001 WI 48, ¶ 42, 243 Wis. 2d 173, 626 N.W.2d 712 (Abrahamson, C.J., concurring). This court heard oral arguments regarding this case and *A.S.* on the same day, and we have released these cases together as companion cases.

[7] While considering the legislation that later was enacted as § 947.01, the Legislative Council's Judiciary Committee explained the scope of the disorderly conduct statute as follows:

certain viewpoints within a category of unprotected conduct while leaving related viewpoints within the same category of speech outside its scope. For these reasons, we conclude that the First Amendment does not inherently bar the State from applying § 947.01 to unprotected speech, even if the unprotected speech is purely written speech.

¶ 22. Although to date this court has not reviewed a case in which a defendant was convicted under § 947.01 based solely on the content of his or her speech, we have construed "disorderly conduct" to proscribe some categories of constitutionally unprotected speech. In *Teske v. State*, 256 Wis. 440, 41 N.W.2d 642 (1950), this court examined the scope of the 1947 version of the disorderly conduct statute, Wis. Stat. § 348.35,[8] to determine whether the statute could be construed to punish a union leader for inciting striking union members to resist a police officer. In arguing that case, the union leader contended that the statute only reached language; it could not be stretched to criminalize acts alone. *Id.* at 444. We rejected this argument, explaining that "[t]he words of the statute must be read in the disjunctive, that is, they make it an offense to

"The words 'violent, abusive, indecent, profane, boisterous, unreasonably loud. . .conduct' give certainty to the crime while at the same time being broad in scope. On the other hand, they are not broad enough to take care of every situation generally considered to be disorderly." 5 Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code* 208 (1953).

[8] Section 348.35 (1947) provided in pertinent part: "Any person who shall engage in any violent, abusive, loud, boisterous, vulgar, lewd, wanton, obscene or otherwise disorderly conduct tending to create or provoke a breach of the peace or to disturb or annoy others, whether in a public or a private place [is guilty of disorderly conduct.]"

use such language *or* to engage in disorderly conduct tending to the result described." *Id.* Thus, we concluded that the statute could be interpreted to apply to disorderly physical acts. *Id.* However, in doing so, we made clear that the statute also could be applied to speech, unaccompanied by physical acts. *Id.*

¶ 23. This court suggested a similar interpretation in *Lane v. Collins*, 29 Wis. 2d 66, 138 N.W.2d 264 (1965). The issue in *Lane* in part was whether the trial court properly denied the defendant police officer's motion for a directed verdict in a false imprisonment tort case where the officer arrested the plaintiff for violating a disorderly conduct ordinance based on the plaintiff's statement that he thought the officer was a "son-of-a-bitch," but where there was evidence suggesting that the officer had provoked the statement. *Id.* at 69–71. In coming to our conclusion that the trial court had properly denied the motion, we explained that the disorderly conduct ordinance at issue was:

> similar in import to that portion of sec. 947.01[ ], Stats., entitled "Disorderly Conduct," which makes it a misdemeanor for a person to engage "in. . .abusive, indecent, [or] profane. . .conduct . . ." in a public or private place. The underlying reason for disorderly conduct statutes and ordinances proscribing abusive language is that such language tends to provoke retaliatory conduct on the part of the person to whom it is addressed that amounts to breach of the peace. *Calling another person a "son-of-a-bitch" under charged circumstances might well constitute abusive language which is likely to have that result.*

*Id.* at 71–72 (emphasis added; footnote omitted). Like the analysis in *Teske*, this language indicates that

under certain circumstances, § 947.01 can be applied to speech alone.

¶ 24.   This interpretation comports with the language and purpose of § 947.01—to root out conduct that unreasonably disturbs the public peace. *See Maker*, 48 Wis. 2d at 614–15 (explaining considerations underlying disorderly conduct statute). To be certain, § 947.01, like the laws at issue in *Teske* and *Lane*, is not a blanket proscription of certain words. By contrast, it is a recognition of the fact that in some circumstances words carry with them proscribable nonspeech elements. *R.A.V.*, 505 U.S. at 386. For example, "unreasonably loud" speech—even if the words themselves are protected by the First Amendment—carries with it the nonspeech element of excessive volume. Similarly, "abusive" speech carries with it the nonspeech element of an express or implied threat or challenge to fight. These nonspeech elements constitute the proscribed "conduct" under § 947.01. And it is these elements that, consistent with the First Amendment, can be punished under § 947.01.[9]

■

¶ 25.   Pursuant to this understanding of § 947.01, we conclude that the State is not barred from convicting Douglas for the content of his story merely because his story consisted of purely written speech. However,

---

[9] Because, as explained above, conduct must be examined in light of all the surrounding circumstances, conduct that is protected by the First Amendment under one set of circumstances may be prosecutable under different circumstances. For example, political speech generally is protected by the First Amendment and, thus, falls outside the scope of § 947.01. However, shouting political speech over a megaphone in a residential area at 2:00 a.m. likely would be deemed prosecutable disorderly conduct.

the State still has the burden to prove that Douglas's speech is constitutionally unprotected "abusive" conduct, within the punitive reach of § 947.01.

## B

¶ 26.   Douglas also contends that his speech, even if it is an otherwise punishable threat, did not occur under circumstances where such speech would cause or provoke a "disturbance" under § 947.01.   Citing *Zwicker*, 41 Wis. 2d at 508, Douglas explains that this court has defined "disorderly conduct" as conduct which has a tendency to "menace, disrupt or destroy public order." Pursuant to this definition, Douglas argues, § 947.01 requires more than conduct that may cause personal discomfort in others. Applying this reasoning to the facts at hand, Douglas thus contends that because there is no evidence that his story caused anything more than personal discomfort in Mrs. C, he cannot be punished for disorderly conduct.

¶ 27.   Douglas is correct insofar as he indicates that not all conduct which causes personal discomfort in others necessarily falls within the ambit of disorderly conduct. This court has held as much:

> [Section 947.01] does not imply that all conduct which tends to annoy another is disorderly conduct. Only such conduct as unreasonably offends the sense of decency or propriety of the community is included. The statute does not punish a person for conduct which might possibly offend some hypercritical individual. The design of the disorderly conduct statute is to proscribe substantial intrusions which offend the normal sensibilities of average persons or which constitute significantly

abusive or disturbing demeanor in the eyes of reasonable persons.

*Zwicker*, 41 Wis. 2d at 508. Thus, we agree that § 947.01 requires more than mere offensive speech or behavior.

¶ 28. However, we cannot agree with Douglas's contention that threatening a public school teacher while in school is not the type of conduct that tends to cause or provoke a disturbance. School violence is all too prevalent in our schools today. *See State v. Angelia D.B.*, 211 Wis. 2d 140, 157, 564 N.W.2d 682 (1997) (noting the "growing incidence of violence and dangerous weapons in schools"); *Isiah B. v. State*, 176 Wis. 2d 639, 662, 500 N.W.2d 637 (1993) (Bablitch, J., concurring) (citing numerous articles supporting the proposition that "problems in our public schools have turned deadly"); Bureau of Just. Stats., U.S. Dep't of Just., & Nat'l Ctr. for Educ. Stats., U.S. Dep't of Educ., *Indicators of School Crime and Safety, 1999* (1999) (providing a litany of statistics regarding the frequency of school violence). Concomitantly, the threat of violence intrudes our children's places of learning. *See* Office of Juv. Just. & Delinq. Prevention, U.S. Dep't of Just., *Juvenile Offenders and Victims: 1999 National Report* 68 (1999) (noting that in Wisconsin in 1997, five percent of high school students carried a weapon to school on at least one occasion); Bureau of Just. Stats., U.S. Dep't of Just., & Nat'l Ctr. for Educ. Stats., U.S. Dep't of Educ., *Indicators of School Crime and Safety, 1999* vii (1999) (noting that in 1997 approximately seven to eight percent of students reported being threatened with a weapon). Our children consequently

often must learn in an environment of fear,[10] in which education suffers: "Violence in schools makes teaching difficult and inhibits student learning. In addition, unsafe school environments expose students who may already be at risk for school failure to other failure-related factors such as physical and emotional harm." Nat'l Ctr. for Educ. Stats., U.S. Dept. of Educ., *The Condition of Education* 80 (1999). For these reasons, the public has become increasingly concerned with serious student threats of violence. *Cf. id.* With this in mind, we cannot imagine how a student threatening a teacher could not be deemed conduct that tends to menace, disrupt, or destroy public order. *See Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 372 (9th Cir. 1996) ("In light of the violence prevalent in schools today, school officials are justified in taking very seriously student threats against faculty or other students.").

¶ 29. It makes no difference under § 947.01 whether, as Douglas asserts, alleged disorderly conduct actually causes a disturbance. *State v. Givens*, 28 Wis. 2d 109, 116, 135 N.W.2d 780 (1965). Rather, the conduct only need be the type of conduct that *tends* to disturb others. *Id.* (quoting 5 Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code* 208 (1953) ("The question is not whether a particular person was disturbed or annoyed but whether the conduct was of a kind which tends to disturb or annoy others.")). Simply because a listener exhibits fortitude in the face of a threat is no reason to allow the threat to

---

[10] "For many school-age children. . .fear is a realistic response to conditions in and around their schools." Shay Bilchik, Office of Juv. Just. & Delinq. Prevention, U.S. Dep't of Just., *From the Administrator*, Juv. Just. Bull. 1 (Apr. 1998). .

go unpunished. Accordingly, we conclude that the fact that Douglas's story did not cause an actual disturbance is irrelevant to the present inquiry. It is enough that Douglas conveyed his story to Mrs. C under circumstances where such conduct tends to cause or provoke a disturbance.

## III

¶ 30. We next must consider whether Douglas's story is protected by the First Amendment, thus falling outside the bounds of conduct prosecutable under § 947.01. The circuit court ruled that Douglas's story "is not the type of activity that is allowed under. . .the First Amendment." However, the court supported this ruling only with its conclusory finding that "[t]here is no question that this [story] is a direct threat to the teacher."[11] Assuming arguendo that the circuit court

___

[11] Contrary to the dissent's suggestions, this is the *only* finding of fact that the circuit court made to support its conclusion' that Douglas's speech is not protected by the First Amendment. To be sure, the dissent suggests that there are numerous other "facts" in the record. However, the dissent does not state what these facts might be. Instead, while ostensibly recognizing the statutory mandate that juvenile records remain confidential, Wis. Stat. § 938.78 ("Confidentiality of records"), the dissent inserts blank lines that it presumably hopes will indicate relevant facts that somehow dictate the outcome in this case. *See* dissent at ¶¶ 86, 91–93. In doing so, the dissent not only acknowledges that it relies on impermissible, inadmissible, and possibly non-existent evidence, but it invites others to speculate what that evidence may be.

Moreover, even if such facts exist and are relevant and admissible, there is no evidence that any such facts were presented to the circuit court during the fact-finding hearing on this matter. And even if we assume arguendo that the circuit court was aware of these alleged facts at the time of the fact-

correctly found that Douglas's story is a "threat" to Mrs. C, this finding did not warrant the court to make the logical jump to conclude that Douglas's story necessarily constitutes a "true threat," unprotected by the First Amendment.

## A

■■■■

¶ 31.  Contrary to the court of appeals holding, *Douglas D.*, unpublished slip op. at 3 n.3, for purposes of First Amendment analysis, a "threat" is very different from a "true threat." "Threat" is a nebulous term that can describe anything from "[a]n expression of an intention to inflict pain, injury, evil, or punishment" to any generalized "menace." *The American Heritage Dictionary of the English Language* 1868 (3d ed. 1992). Under such a broad definition, "threats" include protected and unprotected speech. Thus, states cannot enact general laws prohibiting all "threats" without infringing on some speech protected by the First Amendment. By contrast, "true threat" is a constitutional term of art used to describe a specific category of unprotected speech. *State v. Perkins*, 2001 WI 46, ¶ 17, 243 Wis. 2d 141, 626 N.W.2d 762; *see also Watts*, 394 U.S. at 707–08. This category, although often inclusive of speech or acts that fall within the broader definition of "threat," does not include protected speech. *See United States v. Miller*, 115 F.3d 361, 363 (6th Cir. 1997); *Perkins*, 2001 WI 46, at ¶ 17. Therefore, states

finding hearing, we nonetheless must take notice that there is no evidence that the circuit court relied on these facts as a basis for its ruling.

It should go without saying that courts are bound to decide cases based on the facts before them. We find it unfortunate that the dissent does not deem itself bound by this imperative.

may, consistent with the First Amendment, prohibit all "true threats."

¶ 32.   Wisconsin prohibits true threats that occur under circumstances where such conduct tends to cause or provoke a disturbance by means of the § 947.01 prohibition on "abusive" conduct. "Abusive" conduct is conduct that, at least in part, is "injurious, improper, hurtful, offensive, [or] reproachful." *Black's Law Dictionary* 11 (6th ed. 1990); *see also The American Heritage Dictionary of the English Language* 8 (3d ed. 1992) (defining "abusive" in part as "[c]haracterized by abuse"; defining "abuse" in part as "[i]nsulting or coarse language"). True threats clearly fall within the scope of this definition. Consequently, if Douglas's story constitutes a true threat, the State properly could prosecute him for violating the § 947.01 prohibition on "abusive" conduct.

## B

¶ 33.   We thus must determine whether Douglas's story constitutes a true threat. The question of whether particular conduct constitutes a true threat is an issue of fact, typically best left for the finder of fact. *Perkins*, 2001 WI 46, at ¶ 48. However, if the conduct unquestionably is protected by the First Amendment, a court may dismiss the charge as a matter of law. *Id.*

¶ 34.   As this court explained in *Perkins*, a true threat is a statement that, in light of all the surrounding circumstances,

> a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression

of a purpose to inflict harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views, or other similarly protected speech.[12] It is not necessary that the speaker have the ability to carry out the threat.

*Id.* at ¶ 29.[13] Some factors that courts and juries should consider when applying this test include, but are not limited to:

---

[12] We recognize that there may be instances where true threats are conveyed by means other than pure speech. For this reason, the terms "speaker" and "listener" should be broadly construed to encompass all conveyors and recipients of true threats.

We further note that the "reasonable speaker" and "reasonable listener" are not to be misconstrued as omniscient persons, aware of every fact potentially existing at the time of the speech. The "reasonable speaker" and "reasonable listener" are limited in knowledge to the facts readily available to the actual speaker and/or the actual listener at the time of the speech at issue.

[13] Contrary to the contentions in the concurrences by Chief Justice Abrahamson and Justice Bablitch, this test does not require specific intent. As explained in *State v. Perkins*, 2001 WI 46, ¶ 29, 243 Wis. 2d 141, 626 N.W.2d 762, the true-threat test applies "an objective reasonable person standard," based on reasonable foreseeability, not intent. This standard does not legally or logically require a finding of specific—*i.e.*, subjective—intent. Further, we note that the vast majority of federal appellate courts and state supreme courts to have considered the issue rejected the argument that true threats require specific intent. *See, e.g., United States v. Francis*, 164 F.3d 120, 123 (2d Cir. 1999); *United States v. Whiffen*, 121 F.3d 18, 21 (1st Cir. 1997); *United States v. Myers*, 104 F.3d 76, 81 (5th Cir. 1997); *United States v. Himelwright*, 42 F.3d 777, 782–83 (3d Cir. 1994); *United States v. Darby*, 37 F.3d 1059, 1066 (4th Cir. 1994); *United States v. DeAndino*, 958 F.2d 146, 149 (6th Cir. 1992); *People v. Baer*, 973 P.2d 1225, 1233–34 (Colo. 1999) (en

how the recipient and other listeners reacted to the alleged threat, whether the threat was conditional,[14] whether [the threat] was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.

*Id.* at ¶ 31 (citation omitted).

¶ 35.   In the present case, Douglas argues that his story was not a true threat because it did not express an "unequivocal, unconditional and specific expression[ ] of intention immediately to inflict injury." *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976). He contends that his story is a fictional, third-person creative writing assignment, which should receive full protection under the First Amendment.

¶ 36.   Conversely, the State contends that Douglas's story is a true threat. According to the State's

banc); *In the Interest of R.T.*, No. 00–CK–0205, 2001 WL 170927, at *4 (La. Feb. 21, 2001).

[14] This is not to suggest that ambiguous or conditional language cannot constitute a true threat. *See United States v. Fulmer*, 108 F.3d 1486, 1492 (1st Cir. 1997) ("The use of ambiguous language does not preclude a statement from being a threat."); *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990) ("Most threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats. They are threats nonetheless." (citation omitted)). Additionally, "[t]he fact that a threat is subtle does not make it less of a threat." *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990) (citation and quotation omitted); *see also United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994) (holding that the jury must consider the reasonable connotations of speech in determining whether the speech is a "true threat").

argument, the first two paragraphs of Douglas's story closely parallel the events that had taken place immediately before Douglas began his assignment: a teacher named Mrs. C removed a male student from her class. The next two paragraphs, the State contends, convey the threat: when the teacher disciplined the student the following day, the student used a machete to cut off the teacher's head. Further, the State attributes great weight to the fact that Douglas handed his story directly to Mrs. C—the subject of his threat—rather than, for example, reading it in jest to his friends. In light of these circumstances, the State argues that Douglas's threat to Mrs. C is direct and clear: If she disciplines him again, he intends to injure her. Thus, the State argues that Douglas's story expresses a true threat.

¶ 37.   Applying the *Perkins* test set forth above, while we believe that Douglas's story is crude and repugnant, we nonetheless must reject the State's argument. To be sure, Mrs. C testified that Douglas's story frightened her. Further, Douglas conveyed his message directly to Mrs. C, the alleged victim of the threat. However, there is no evidence that Douglas had threatened Mrs. C in the past or that Mrs. C believed Douglas had a propensity to engage in violence.

¶ 38.   Moreover, Douglas wrote his story, pursuant to Mrs. C's request, in the context of a creative writing class. In such a class, teachers and students alike should expect and allow more creative license—be it for better or, as in this case, for worse—than in other circumstances. Had Douglas penned the same story in a math class, for example, where such a tale likely would be grossly outside the scope of his assigned work, we would have a different case before us.

¶ 39.   But in the context of a creative writing class, Douglas's story does not amount to a true threat. First, the story does not contain any language directly addressed from Douglas to Mrs. C. Rather, it is written in the third person, with no mention of Douglas. Second, Douglas's story contains hyperbole and attempts at jest. It jokes that the "C" in "Mrs. C" is short for "crab." In addition, it suggests that Mrs. C is so mean that she beats children and speculates that, for this reason, she became a teacher. Third, Mrs. C explained to Douglas that in this particular assignment, he merely was to begin writing a story that other children would complete. Thus, Douglas could have expected another student to end his grisly tale as a dream or otherwise imagined event. Under these specific circumstances, Douglas's story is protected by the First Amendment.[15]

¶ 40.   We do not doubt that the story was a result of Douglas's anger at having been removed from class.

---

[15] As noted above, the dissent suggests that numerous other "facts" support its conclusion that Douglas's story was a true threat. Whatever these facts may be, there is no evidence that Mrs. C or any other person was aware of any of these purported facts at the time of Douglas's alleged threat.

However, unswayed by the dearth of evidence supporting its position, the dissent hypothesizes its own "evidence." *See, e.g.*, dissent at ¶ 93 ("Even if Mrs. [C.] had been unaware of Douglas's entire history and prior delinquency determination, she was certainly cognizant of his discipline problems in class and his frequent truancy."); *id.* at ¶ 109 ("There is a very good chance, however, that Mrs. [C.]—at least after she talked with [the vice principal]—knew something of Douglas's troubles. . .or that she had her own reasons for being afraid of him."). This "evidence" is unsupported by the record. But more disconcertingly, this "evidence" is the product of judicial speculation, which clearly exceeds the proper scope of the present review.

Further, we sympathize with Mrs. C; she was justified in feeling offended. And we firmly believe that the school took appropriate disciplinary action against Douglas.

¶ 41.   However, a thirteen-year-old boy's impetuous writings do not necessarily fall from First Amendment protection due to their offensive nature. As the Supreme Court explained:

> To many, the immediate consequence of this [First Amendment] freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. . . .We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

*Cohen v. California*, 403 U.S. 15, 24–25 (1971). With this in mind, we conclude that Douglas's story, although we find it to be offensive and distasteful, unquestionably is protected by the First Amendment. Our feelings of offense and distaste do not allow us to set aside the Constitution.[16] We therefore hold as a

---

[16] We recognize that public opinion regarding protected freedoms may wax and wane over time. However, courts should not easily be swayed by public opinion, particularly in matters of constitutional rights. As the United States Supreme Court has observed: "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied

matter of law that Douglas's story cannot be prosecuted under § 947.01.

### IV

■

¶ 42.   By no means should schools interpret this holding as undermining their authority to utilize their internal disciplinary procedures to punish speech such as Douglas's story. Although the First Amendment prohibits law enforcement officials from prosecuting protected speech, it does not necessarily follow that schools may not discipline students for such speech.

[17]

¶ 43.   To be sure, students do not shed their First Amendment rights at the schoolhouse gate. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Thus, like law enforcement officials, educators

---

by the courts." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

Unfortunately, the dissent seems willing to sidestep these legal principles. In its seeming urgency to satisfy public opinion and convince the majority of this court and this state that Douglas's conduct must be removed from First Amendment protection, the dissent cites as support everything from FBI symposium publications to magazine articles to myriad newspaper headlines. However, as Justice Crooks' concurring opinion aptly notes, the dissent scarcely cites the stuff of judicial import—the Constitution and those cases and statutes that interpret it.

Ever conscious of the principles undergirding the Constitution, this court must not succumb to public pressure when deciding the law. Headlines may be appropriate support for policy arguments on the floor of the legislature, but they cannot support an abandonment in our courthouses of the constitutional principles that the judiciary is charged to uphold.

may not punish students merely for expressing unpopular viewpoints. *See id.* at 509.

¶ 44.   However, the First Amendment "must be 'applied in light of the special characteristics of the school environment.' " *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker*, 393 U.S. at 506). Unlike other instruments of the State, schools are entrusted with a unique role in our society—to mold our children into responsible and wise adult citizens. *See Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954) (describing schools as "the principal instrument in awakening the child to cultural values"). This "educational mission" is not limited to academics. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986). Rather, it also entails many other responsibilities—adviser, friend, counselor, and, all too often, parent-substitute. *See Goss v. Lopez*, 419 U.S. 565, 594 (1975) (Powell, J., dissenting). Pursuant to these responsibilities, educators must inculcate in our children "the habits and manners of civility." *Bethel Sch. Dist.*, 478 U.S. at 681 (citation omitted).

¶ 45.   While the "fundamental values of 'habits and manners of civility' essential to a democratic society must, of course, include tolerance of divergent. . .views, even when the views expressed may be unpopular," they also include society's countervailing interest in teaching our children the boundaries of socially acceptable methods of discourse. *Id.* For this reason, in the school context, schools may limit or discipline "conduct. . .which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or

238

invasion of the rights of others."[17] *Tinker*, 393 U.S. at 513. Hence, under some circumstances, schools may discipline conduct even where law enforcement officials may not. *Cf. Angelia D.B.*, 211 Wis. 2d at 155 (holding that "inherent differences" between police officers and educators warrant different legal standards for searches and seizures).

¶ 46.   Under the circumstances in the present case, we hold that the school had more than enough reason to discipline Douglas for the content of his story. Although the story is not a true threat, it is an offensive, crass insult to Mrs. C. Schools need not tolerate this type of assault to the sensibilities of their educators or students. The First Amendment does not compel "teachers, parents, and elected school officials to surrender control of the American public school system to public school students." *Tinker*, 393 U.S. at 526 (Black, J., dissenting).

## V

¶ 47.   In sum, we reemphasize that we share the public's concern regarding threats of school violence.

---

[17] Further, schools may discipline student speech that is, for example, ungrammatical, poorly written, or inadequately researched. *Cf. Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). While few people likely question this authority, it is important to note that even this type of discipline—be it correcting a typographical error, having a student rewrite a particular assignment, or the like—infringes to some extent upon otherwise protected speech. Nevertheless, when examined in light of the special characteristics of the school environment, this speech, like speech that more dramatically interferes with a school's educational mission, may be disciplined without contravening the First Amendment.

Society need not tolerate true threats. Such speech, even if purely written, can and should be prosecuted under the disorderly conduct statute, § 947.01. However, under the particular facts of this case, the speech at issue fails to rise to the level of a true threat. Douglas's story, though repugnant and insulting, falls within the protection of the First Amendment. As such, it may not be punished as disorderly conduct.

¶ 48.  However, we also recognize that "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." *Bethel Sch. Dist.*, 478 U.S. at 683. Thus, although we hold that Douglas's story is not a true threat and, therefore, cannot be punished under § 947.01, we nonetheless believe that the school properly disciplined Douglas.

¶ 49.  This case reinforces our belief that while some student conduct may warrant punishment by both law enforcement officials and school authorities, school discipline generally should remain the prerogative of our schools, not our juvenile justice system. Accordingly, we reverse the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 50.  SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. I agree with the majority opinion's conclusion that Douglas D.'s creative writing essay is protected by the First Amendment and may not be punished as criminal conduct. I do not, however, join the majority opinion in its expansion of the disorderly conduct statute, Wis. Stat. § 947.01. By interpreting the statute to criminalize the content of

speech alone, that is, speech unaccompanied by any disorderly conduct, the majority opinion engages in an unwarranted judicial rewrite of a fifty-year-old statute.[1]

¶ 51. The majority opinion concludes that the disorderly conduct statute can punish the content of speech alone, even though no published case supports such an application of the statute.[2] So that this statutory interpretation will not run afoul of First Amendment constitutional guarantees, the majority opinion judicially rewrites the statute, narrowing the phrase "abusive conduct" to include true threats, unprotected by the First Amendment, while excluding from the reach of the statute speech that may be abusive but is nonetheless protected by the First Amendment. This strained reading of the disorderly conduct statute is troubling, for three reasons.

---

[1] This novel application of the disorderly conduct statute also arises in a companion case, *In the Interest of A.S.: State v. A.S.*, 2001 WI 48, 243 Wis. 2d 173, 626 N.W.2d 712. I note, however, that the rationale put forth in *A.S.* for applying the disorderly conduct statute to the content of speech alone differs from the rationale offered in this case.

[2] *See* majority op. at ¶¶ 3, 14. The majority opinion goes on to express some apparent doubt about this holding when it explains that " 'abusive' speech carries with it the nonspeech element of an express or implied threat or challenge to fight. These nonspeech elements constitute the proscribed 'conduct' under § 947.01." Majority op. at ¶ 24.

I fail to see the nonspeech element of a written threat. The majority opinion apparently believes that the content of speech may be treated the same way as the volume of the speech, which is a nonspeech element. It is a semantic sleight of hand to suggest that the content of unprotected speech transforms that speech into conduct.

¶ 52. First, the lack of a clear fit between the language of the disorderly conduct statute and speech unprotected by the First Amendment shows that the disorderly conduct statute is overbroad when used to punish the content of speech alone. By its plain language, the disorderly conduct statute criminalizes abusive or otherwise disorderly conduct that tends to provoke a disturbance. The majority defines the term "abusive" as "injurious, improper, hurtful, offensive, [or] reproachful," and notes that true threats "fall within the scope of this definition." *See* majority op. at ¶ 32.

¶ 53. But speech that falls within the definition of "abusive" and is provocative or unsettling may nonetheless be protected by the First Amendment. The U.S. Supreme Court explained this aspect of the First Amendment in *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949), as follows:

> [A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. (Citations omitted.)

¶ 54. Applying the plain language of the disorderly conduct statute to the content of speech alone renders the statute unconstitutionally overbroad. "A

statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate. . . .The essential vice of an overbroad law is that by sweeping protected activity within its reach it deters citizens from exercising their protected constitutional freedoms, the so-called 'chilling effect.' "[3]

¶ 55.   Applying the broadly worded disorderly conduct statute to the content of speech alone would run afoul of the U.S. Supreme Court's holding in *Lewis v. City of New Orleans*, 415 U.S. 130 (1974). In *Lewis*, the Court struck down a conviction under a city ordinance that made it unlawful "to curse or revile or to use obscene or opprobrious language toward or with reference" to a police officer performing his duties. The Court held that it was immaterial that the words used by the appellant might have been constitutionally unprotected under a properly drawn statute or ordinance. The Court declared the ordinance facially overbroad because it would criminalize all vulgar and offensive speech, including speech protected by the First Amendment.[4]

¶ 56.   Yet instead of acknowledging that the statute, as applied to the content of speech alone, is unconstitutionally overbroad, the majority simply

---

[3] *Bachowski v. Salamone*, 139 Wis. 2d 397, 411, 407 N.W.2d 533 (1987) (citation omitted). *See also State v. Janssen*, 219 Wis. 2d 362, 374, 580 N.W.2d 260 (1998).

[4] *See also Gooding v. Wilson*, 405 U.S. 518, 527 (1972) (concluding that the Georgia courts' authoritative construction of a "breach of the peace" statute swept too broadly and was therefore unconstitutional); *Cox v. Louisiana*, 379 U.S. 536, 545 (1965) (holding that a "disturbing the peace" statute was unconstitutionally broad).

relies on this court's conclusion in *State v. Zwicker*, 41 Wis. 2d 497, 164 N.W.2d 512 (1969), that the disorderly conduct statute is not overbroad. *See* majority op. at ¶ 21. *Zwicker*, however, involved protected speech intertwined with conduct, whereas this case represents the first published case in which the statute has been applied to punish solely the content of speech. *Zwicker* does not help the majority opinion under these novel circumstances.[5]

¶ 57. Having stated in conclusory fashion that the statute is not overbroad, the majority opinion then judicially narrows the scope of the statute. It holds that when applied to the content of speech alone, the disorderly conduct statute criminalizes only speech that is not protected by the First Amendment. This court has rejected this kind of rewriting of a statute, stating: "[A] construction which by its very language limits the statute's application to speech and conduct that is not protected by the First Amendment is both impractical and constitutionally suspect. . . .'The problem with that solution is that it simply exchanges overbreadth for vagueness.' "[6] By construing the disorderly conduct

[5] The majority opinion's reliance on *Lane v. Collins*, 29 Wis. 2d 66, 138 N.W.2d 264 (1965), and *Teske v. State*, 256 Wis. 440, 41 N.W.2d 642 (1950) is also misplaced. The ordinance at issue in *Lane* was directed to abusive language and was not challenged on constitutional grounds.

In *Teske*, the picketers, swearing and cursing, pushed officers against a train and forced their way through the cordon formed by officers. *Teske* involved conduct.

[6] *Janssen*, 219 Wis. 2d at 382 n.13 (declining to adopt a limiting construction of a flag desecration statute) (quoting Laurence H. Tribe, *American Constitutional Law* § 12–29, at 1031 (2d ed. 1988)).

*See also State v. Weidner*, 2000 WI 52, ¶ 38, 235 Wis. 2d 306, 611 N.W.2d 684 (declining to rewrite a statute prohibiting

statute in a way that simply exchanges overbreadth for vagueness, the majority opinion infringes on protected forms of expression.[7]

¶ 58.  Second, in light of the legislature's enactment of numerous statutes expressly criminalizing specific kinds of threats,[8] it is hard to accept the State's position that a disorderly conduct statute that has been on the books for over fifty years without being applied to the content of speech alone has suddenly metamorphosed into an anti-threat statute. Yet the majority opinion accepts the State's theory, forgetting that "[d]efining the contours of laws subjecting a violator to criminal penalty is a legislative, not a judicial function."[9]

---

dissemination of harmful material to minors in a way that would render it constitutional when applied in the context of the Internet); *State v. Zarnke*, 224 Wis. 2d 116, 139–140, 589 N.W. 2d 370 (1999) (declining to rewrite a child pornography statute to avoid the unconstitutional result of placing the burden of demonstrating lack of scienter on the defendant).

[7] "The danger posed by a vague law is that officials charged with enforcing the law may apply it arbitrarily or the law may be so unclear that a trial court cannot properly instruct the jury as to the applicable law." *Bachowski*, 139 Wis. 2d at 406–07 (quoting *State v. Popanz*, 112 Wis. 2d 166, 173, 332 N.W.2d 750 (1983)).

[8] *See, e.g.*, Wis. Stat. §§ 940.201 (threat to witnesses); 940.203 (threat to judge); 940.205 (threat to Department of Revenue employee); 940.207 (threat to Department of Commerce or Department of Workforce Development employee); 940.45 (intimidation of victims); 943.30 (threat to injure or accuse of crime); 943.31 (threats to communicate derogatory information); 947.012 (phone calls with intent to threaten); 947.015 (false bomb threat).

[9] *Popanz*, 112 Wis. 2d at 177.

¶ 59.   Third, even if I agreed with the majority's conclusion that the disorderly conduct statute criminalizes the content of speech alone, the statute should not be used to prosecute true threats in the absence of a specific intent to threaten. I conclude that a specific intent is required under the First Amendment.[10] This criminal intent element is absent from the disorderly conduct statute.[11] In the absence of a specific intent requirement, today's novel expansion of

---

[10] *See Bachowski*, 139 Wis. 2d at 411 (noting that the requirements of intent and "no legitimate purpose" in the harassment statute, Wis. Stat. § 947.013, satisfied constitutional requirements, since these elements "make clear that protected expression is not reached by the statute").

*See also State v. Perkins*, 2000 WI 46, ¶ 29 n.20, 243 Wis. 2d 141, 626 N.W.2d 762. In *Perkins,* this court did not need to address whether specific intent is required by the First Amendment. The statute at issue in that case required an intent to threaten. *See* Wis. Stat. § 940.203(2).

[11] The legislature has included a specific intent element in many of the anti-threat statutes. *See, e.g.,* Wis. Stat. §§ 940.203(2)(a) (requiring an intentional threat with knowledge that the individual is a judge or family member); 940.205(2)(a) (requiring an intentional threat with knowledge that the individual is a Department of Revenue employee or family member); 946.03(1)(c)–(d) (requiring the intent that the government be overthrown). *But see* Wis. Stat. §§ 940.43 (statute does not address intent or knowledge); 940.45 (same).

The Model Penal Code sets forth a mens rea requirement for the offense of disorderly conduct. *See* II *Model Penal Code and Commentaries* § 250.2 at 324 (1980) (requiring as an element of the offense that a person act "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof").

The Commentary to the Model Penal Code explains this mens rea requirement as follows:

the disorderly conduct statute infringes, in my opinion, on protected forms of expression.

¶ 60. For the reasons set forth, I write separately.

¶ 61. WILLIAM A. BABLITCH, J. *(concurring)*. In *State v. Perkins*, 2001 WI 46, 243 Wis. 2d 141, 626 N.W.2d 762, the crime charged required that the speaker's intent to threaten was an element of the crime. I joined that opinion because that element was present. However, here the crime charged does not require intent as an element.

¶ 62. In the present case, we are dealing with speech, and only speech, not conduct. We must tread carefully as we skirt perilously close to First Amendment protections. Accordingly, when dealing with speech alone in the context of a crime that does not require intent, I would adopt a test that focuses on both the subjective intent of the speaker and the perspectives of a reasonable listener.

¶ 63. In particular, I would adopt the following test. A "true threat" is not a statement of hyperbole, jest, political dissent, or other similarly protected speech. Rather, a "true threat" is a statement that is

---

Perhaps the most important general limitation on the scope of the offense [of disorderly conduct] is the required culpability. The Model Code demands more than that a person act in a manner offensive to the community. . . .Conviction cannot be had merely on proof that the actor should have foreseen the risk of public annoyance or alarm. This limitation of the offense to those who are consciously indifferent to the public peace and tranquility identifies the ultimate evil at which this provision is aimed and eliminates many abusive applications to which older disorderly conduct statutes were susceptible.

II *Model Penal Code and Commentaries* § 250.2 at 328–29 (1980) (citation omitted).

intended to convey, and does convey to a reasonable listener, a serious expression of an intent to inflict harm. In making this determination, the totality of the circumstances at the time of the statement must be considered, including what was said, how it was said, by whom and to whom, and in what context. From the perspective of the speaker, the focus is on the speaker's subjective intent. It is not necessary that the speaker actually intended to carry out the threat or that the speaker had the actual ability to carry out the threat; it is only necessary that the speaker intended to convey a serious expression of an intent to inflict harm. From the perspective of the listener, the focus is on whether an objectively reasonable listener would perceive the statement as a serious expression of an intent to inflict harm.

¶ 64.   Because the story written by Douglas does not come within the definition of either test of "true threat," I respectfully concur.

¶ 65.   ANN WALSH BRADLEY, J. *(concurring)*. I agree with the majority's First Amendment analysis and its conclusion that the speech in this case is not a true threat, but is rather speech subject to First Amendment protection. However, the majority unnecessarily applies Wis. Stat. § 947.01 and erroneously concludes that the speech at issue would otherwise constitute disorderly conduct.

¶ 66.   The statutory discussion is not warranted because the majority's First Amendment conclusions, alone, require reversal of the court of appeals. Moreover, I disagree with the conclusion the majority draws in its application of the statute. I do not believe that Douglas D.'s conduct in writing the fictional story con-

stitutes disorderly conduct. Accordingly, I do not join in the majority's application of § 947.01 to the facts at hand.

¶ 67.   I am authorized to state that SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE, joins this concurring opinion.

¶ 68.   N. PATRICK CROOKS, J. *(concurring).* I agree with the test for true threats in the majority opinion, the application thereof, and, the resulting reversal of the court of appeals' decision. I write separately, however, to emphasize that our decision today should not be interpreted, by anyone, as imposing a limitation upon a school's ability to discipline its students.

> [B]y and large, "public education in our Nation is committed to the control of state and local authorities," and that federal courts should not ordinarily "intervene in the resolution of conflicts which arise in the daily operation of school systems." *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 507 (1969), noted that we have "repeatedly emphasized. . .the comprehensive authority of the States and of school officials. . .to prescribe and control conduct in the schools."

*Board of Educ. v. Pico*, 457 U.S. 853, 864 (1982) (plurality opinion) (also quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). This quotation applies to state courts as well as federal courts.

¶ 69.   A school can, and should, discipline a student for speech and conduct that is inappropriate and disruptive, and in no way adds to the school's educational mission. This is particularly true here, where the setting is an elementary school.

> [T]he potential "verbal cacophony" of a public forum can be antithetical to the delicate "custodial and tutelary" environment of an elementary school. The cultivation of the "habits and manners of civility" that [*Bethel School Dist. v. Fraser*, 478 U.S. 675, 681 (1986)] held "essential to a democratic society," can require a level of parent-like guidance that has no place in a public forum.

*Muller v. Jefferson Lighthouse School*, 98 F.3d 1530, 1539 (7th Cir. 1996) (other citations omitted).

¶ 70.   I also write separately to express my concerns with the dissenting opinion. I have two overriding concerns. First, I am concerned with the dissent's reliance upon matters that are not in the record, including information about Douglas D. and his family, as well as letters, articles and reports from various sources regarding school violence. This court has not taken, and cannot take, judicial notice of much of this information. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Wis. Stat. § 902.01(2). Moreover, we have established that where a court or a party desires to take judicial notice of a matter, notice should be given to the parties or the adversary, "so as to afford them an opportunity of consulting the same sources or of producing others." *State v. Barnes*, 52 Wis. 2d 82, 88, 187 N.W.2d 845 (1971) (quoting *Fringer v. Venema*, 26 Wis. 2d 366, 373, 132 N.W.2d 565, 133 N.W.2d 809 (1965)). "A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." Wis. Stat. § 902.01(5). Without such a proce-

dural safeguard, matters that are actually in dispute may be relied upon as if they were established fact.

¶ 71. Along a similar vein, the dissent relies upon non-legal materials as if they were legal authority. Here, the law—the United States and Wisconsin Constitutions, related statutes, and the cases interpreting them—provides sufficient authority to decide this case. The dissent's dependence upon non-legal material, which may not be accurate or reliable, undermines the dissent's conclusions, and the public's perception that this court relies upon sound legal principles.

¶ 72. My second concern with the dissent is that it implies that the majority has suppressed relevant information. The information the dissent apparently refers to, using blanks and brackets, is from confidential material—specifically, a dispositional report—contained in Douglas D.'s juvenile record. There is nothing to indicate that the report was relied upon by the circuit court, or the court of appeals, in reaching the decision we review today.

¶ 73. A juvenile's record is confidential, and should remain so, in most instances. *See* Wis. Stat. § 938.78. The dispositional report is not prepared until a juvenile has been adjudged delinquent. Wis. Stat. § 938.33(1). The dispositional report is prepared for the dispositional hearing, much like a pre-sentence report is prepared prior to sentencing in an adult criminal proceeding. *See* Wis. Stat. § 972.15. Here, the circuit court judge reached the decision at issue before receiving this report—indeed even before scheduling the dispositional hearing—and thus could not have relied upon the dispositional report. The dissent's suggestion that the circuit court judge relied upon an earlier dispositional report, prepared in connection with an entirely

251

separate proceeding (*see* ¶ 98), in reaching his decision here is nothing short of speculation.

¶ 74. The authority of schools to discipline students for behavior that is inappropriate and disruptive is not limited by our opinion today. However, that authority should not be improperly bolstered by referring to confidential material and relying upon questionable authority not in the record, as is done by the dissent. For these reasons, I respectfully concur with the majority.

¶ 75. I am authorized to state that Justice JON P. WILCOX joins this concurrence.

¶ 76. DAVID T. PROSSER, J. *(dissenting)*. This case comes to the court against a disturbing backdrop of school violence. Over the past eight years, American education has endured an unprecedented outbreak of shooting incidents and other violence at schools across the United States. Parents, teachers, school administrators, and students have become hauntingly familiar with such names as Grayson, Kentucky (2 deaths, 1993); Lynnville, Tennessee (2 deaths, 1995); Blackville, South Carolina (3 deaths, 1995); Redlands, California (1 death, 1995); Moses Lake, Washington (3 deaths, 1996); Bethel, Alaska (2 deaths, 1997); Pearl, Mississippi (2 deaths, 1997); West Paducah, Kentucky (3 deaths, 1997); Jonesboro, Arkansas (5 deaths, 1998); Edinboro, Pennsylvania (1 death, 1998); Fayetteville, Tennessee (1 death, 1998); and Springfield, Oregon (2 deaths, 1998), all of which occurred before the incident in this case and all of which preceded the 15 deaths at

Columbine High School in Littleton, Colorado in 1999.[1] A number of these shooting deaths were perpetrated by boys between 12 and 14 years of age.

¶ 77.    Most schools have responded to the specter of violence with additional planning and precaution. In 1998, United States Attorney General Janet Reno and Secretary of Education Richard W. Riley asked school principals and teachers to make sure that "every school in this nation has a comprehensive violence prevention plan in place." Letter from Richard W. Riley and Janet Reno, to Principal and Teachers (Aug. 22, 1998) (a letter widely distributed to schools throughout the nation), *reprinted in* Critical Incident Response Group, U.S. Dep't of Justice, *The School Shooter: A Threat Assessment Perspective* (1999) [hereinafter *The School Shooter*]. The two cabinet officers warned against "over labeling"—that is, stigmatizing all children who display danger signs. Nevertheless, they put school officials on alert to prepare for contingencies and watch for trouble.

¶ 78.    Teachers and students are now encouraged to report all threats so that they can be evaluated, because the ability to act on early warning signs has repeatedly headed off additional tragedy.[2]

---

[1] Julie Underwood et al., *School Safety: Working Together to Keep Schools Safe at http:// www.keepschoolssafe.org/ school.html* (last visited Apr. 26, 2001).

[2] *See* Amanda Bower, *Scorecard of Hatred*, Time, Mar. 19, 2001, at 31–32. The article offers thumbnail sketches of 20 incidents of violence or potential violence since Columbine, several of which were "foiled" when students or teachers reported students who signaled lethal intentions. The events described in *In the Interest of A.S.*, 2001 WI 48, 243 Wis. 2d 173, 626 N.W.2d 712, also occurred after the Columbine tragedy, but they were not included in the Time article.

¶ 79.   School officials must contemplate not only those troubled youngsters who may precipitate a violent episode but also students who may act as copycats. In addition, they must prepare for the bomb threats that may appear as aftershocks to incidents of school violence. Having a clear obligation to protect students and teachers, school officials may not safely assume that any school is immune from danger.

## THREAT ASSESSMENT

¶ 80.   In July 1999, the FBI's National Center for the Analysis of Violent Crime convened a national symposium on school violence. The symposium led to publication of *The School Shooter*, a valuable resource to help school officials and others assess the seriousness of student threats. This threat assessment manual makes the point that:

> All threats are NOT created equal. However, all threats should be accessed [sic] in a timely manner and decisions regarding how they are handled must be done quickly.
>
> . . . .
>
> Threat assessment seeks to make an informed judgment on two questions: how credible and serious is the threat itself? And to what extent does the threatener appear to have the resources, intent, and motivation to carry out the threat?

*The School Shooter, supra*, at 5.

¶ 81.   The report explains that threats are made for a variety of reasons:

> A threat may be a warning signal, a reaction to fear of punishment or some other anxiety, or a demand for attention. It may be intended to taunt; to intimidate; to assert power or control; to punish; to manipulate or coerce; to frighten; to terrorize; to

> compel someone to do something; to strike back for an injury, injustice or slight; to disrupt someone's or some institution's life; to test authority, or to protect oneself. The emotions that underlie a threat can be love; hate; fear; rage; or desire for attention, revenge, excitement, or recognition.

*Id.* at 6.

¶ 82.   The report categorizes threats as direct threats, indirect threats, veiled threats, and conditional threats.[3] It suggests that there are three levels of threats ranging in severity from low to high. *Id.* at 8–9. The first task for officials is to assess the threat itself.

¶ 83.   The report also proposes a four-pronged assessment model, based upon the "totality of the circumstances," for assessing the threatener. The four prongs are listed as follows:

Prong One:   Personality of the student

Prong Two:   Family dynamics

Prong Three:   School dynamics and the student's role in those dynamics

Prong Four:   Social dynamics

*Id.* at 10–14.

¶ 84.   The analysis in *The School Shooter* is useful in reviewing this case. The publication states unequivocally that "[a]ll aspects of a threatener's life must be considered when evaluating whether a threat is likely to be carried out." *Id.* at 10.

---

[3] The majority opinion acknowledges that ambiguous or conditional language may constitute a threat. It implies that, in appropriate circumstances, such a threat may constitute a "true threat." Majority op. at ¶ 34 n.12.

¶ 85. The record before this court reveals much more about Douglas D. than the majority has disclosed. This information is highly relevant to how persons who knew Douglas and his background reacted to his alleged threat.

¶ 86. In October 1998, 13-year-old Douglas D. was a troubled young man. He was [————————]. He had [————————]. He had developed a pattern of skipping school and [————————]. On [————], he was adjudicated delinquent for [————————]. This adjudication occurred in [————] 1998.[4]

¶ 87. Douglas began a new school term on August 24, 1998. His eighth-grade English teacher, Mrs. [C.], was starting her first full year of teaching. Mrs. [C.], who was known to her students as Mrs. C., had disciplinary problems with Douglas.

¶ 88. On Monday, October 5, 1998, Mrs. [C.] commenced a creative writing project in her English class. She asked each student to write a story. After reviewing the stories, Mrs. [C.] was to give each story to another student who would add to it, then to a third student, and finally to a student who would finish the story. Douglas was not given this assignment until Wednesday, October 7, because he was absent from class on Monday and Tuesday.

¶ 89. "Doug refused to start the story," Mrs. [C.] later testified. "He wanted to talk and visit with his friends and disrupt the class." Mrs. [C.] said that Doug-

---

[4] *See* majority op. at ¶ 30 n.11 and concurring op. of Justice Crooks at ¶¶ 72–73. It is more than ironic that this court is formulating constitutional principles about freedom of speech while suppressing highly relevant information upon which others have relied.

las "was disrupting the other students in the class, continually talking. . .and making gestures and saying funny things. . .and clowning around." Consequently, Mrs. [C.] sent him out into the hallway to work on the assignment.

¶ 90.   When Douglas returned to class, he gave Mrs. [C.] his story. She "panicked" when she saw what he had written. "He wrote that he was going to cut my head off with a machete," she said. "I had. . .never received anything like that before. . . .I felt my life was in danger."

¶ 91.   Immediately after class, Mrs. [C.] called vice principal [————————] to explain the situation. [The vice principal] read the story and considered it a veiled threat. "In my opinion the paper rose to the level of threatening one of our staff members," he said at trial.[5]

¶ 92.   [The vice principal] promptly notified [————————], the juvenile caseworker for the Oconto County Department of Human Services who had been assigned to Douglas as a result of [———]. [The caseworker] did not interview Douglas until the following day, however, because Douglas had run away. When Douglas was taken into custody, he was placed in secure detention. [The caseworker] said at trial that Douglas admitted to him that the "Mrs. C." in his story was Mrs. [C.]. Shortly thereafter, in a different proceeding, [the caseworker] recommended to the court that [————————].

---

[5] On cross examination, [the vice principal] said he viewed the story as a veiled threat: "There were several points that came very close to home, to reality, and that in turn threatened Mrs. [C.]. . . .I believe if a student. . .is allowed to go unchecked with this sort of a threat, it can be a threat to all of the staff members."

¶ 93.  These are the facts. All these facts were known to Judge Delforge before trial because of Douglas's prior delinquency proceeding in front of the same judge, which included [————————].[6] There is explicit discussion of Douglas's prior delinquency in the trial record. Even if Mrs. [C.] had been unaware of Douglas's entire history and prior delinquency determination, she was certainly cognizant of his discipline problems in class and his frequent truancy. Plainly, [the vice principal] had knowledge of Douglas's juvenile record.

¶ 94.  At trial, Douglas denied that his story mentioning "Mrs. C." was directed at Mrs. [C.], although at one point he blurted out, "I was meaning it for her," before he corrected himself. He admitted he "wasn't happy she kicked me out in the hall," but he claimed under oath that he wasn't really sure if Mrs. [C.] went by the name of "Mrs. C." "I never really heard her be called that," he testified.

¶ 95.  At the conclusion of the trial the circuit judge made the following determination:

> [T]here is absolutely no social value achieved by the juvenile's conduct in completing an assignment. . .that makes a direct threat to his teacher. That is not the type of activity that is allowed either under the First Amendment or any other right that a student has in a classroom. . . .

---

[6] The dispositional report prepared after the court's finding of delinquency in this case summarizes Douglas's family history. The report states that it is summarizing the family history because a prior dispositional report, prepared for the same judge in Douglas's earlier adjudication of delinquency, fully recounts the juvenile's family history.

> There is no question that this is a direct threat to the teacher. . . .It's not the type of action that we're going to allow in our classrooms.

The court found that Douglas's writing "did cause and provoke a disturbance as Mrs. [C.] was very upset at receiving" and reading Douglas's story. The court said there was no other way it could view Douglas's story than "as a direct threat to his teacher, Mrs. [C.]. Mrs. C and Mrs. [C.] are one in the same."

¶ 96. The threat assessment analysis in *The School Shooter* tends to substantiate the circuit court's determinations, particularly when the focus is placed upon Douglas, the "threatener." For instance, *The School Shooter* lists many factors to consider in evaluating a student under Prong One of its threat assessment test: Personality Traits and Behavior. Some of these factors include:

> (1) Low tolerance for frustration; (2) "Injustice Collector" (The student nurses resentment over real or perceived injustices.); (3) Narcissism (The student is self-centered, lacks insight into others' needs and/or feelings, and blames others for failures and disappointments.); (4) Exaggerated Sense of Entitlement; (5) Exaggerated or Pathological Need for Attention; (6) Externalizes Blame (The student consistently refuses to take responsibility for his or her own actions and typically faults other people, events or situations for any failings or shortcomings.); (7) Anger Management Problems; (8) Inappropriate Humor; (9) Change of Behavior; (10) Unusual Interest in Sensational Violence; and (11) Behavior Appears Relevant to Carrying Out a Threat.

*The School Shooter, supra,* at 17–21 (numerals added and factors omitted).

¶ 97.   Some of the factors to consider under Prong Two of the threat assessment test, Family Dynamics, include:

(1) Turbulent Parent-Child Relationship (The student's relationship with his parents is particularly difficult or turbulent. This difficulty or turbulence can be uniquely evident following a variety of factors, including recent or multiple moves, loss of a parent, addition of a step parent, etc. He expresses contempt for his parents and dismisses or rejects their role in his life. There is evidence of violence occurring within the student's home.); (2) Lack of Intimacy (The family appears to lack intimacy and closeness. The family has moved frequently and/or recently.).

*Id.* at 21 (numerals added and factors omitted).

¶ 98.   Mrs. [C.], [the vice principal], [the caseworker], and Judge Delforge all had first-hand knowledge of Douglas D. Judge Delforge had a full report on Douglas's family history *before* the trial in this case because of the prior proceedings dealing with Douglas. Consequently, it is not unreasonable to believe that Judge Delforge and the other principal figures in this case considered many of the factors enumerated in the threat assessment manual as each of them evaluated Douglas's conduct. Most of the listed factors are applicable to Douglas's case. It is manifest that the teacher, the vice principal, the juvenile caseworker, the assistant district attorney, the circuit judge, and the court of appeals took Douglas's story seriously and considered it to be a threat to Mrs. [C.].

*0*

## STANDARD OF REVIEW

¶ 99.   In State v. Perkins, 2001 WI 46, 243 Wis. 2d 141, 626 N.W.2d 762, decided today, we assert that courts have viewed "the question whether an alleged statement constitutes a true threat, unprotected by the First Amendment, as an issue of fact for the fact finder unless a court can determine that the evidence is insufficient, as a matter of law, to support the defendant's conviction under the statute." Perkins, 2001 WI 46 at ¶ 48 (citations omitted). A circuit court's findings of fact shall not be set aside unless clearly erroneous, giving due regard to the opportunity of the trial court to judge the credibility of witnesses. Wis. Stat. § 805.17(2).[7]

¶ 100.   To get around this deference to the circuit court, the majority concludes that Douglas's story "unquestionably is protected by the First Amendment. . .[and as a matter of law] cannot be prosecuted under § 947.01." Majority op. at ¶ 41. Even so, the majority opinion opens a second front by quibbling with some of the circuit court's common-sense factual determinations.[8]

---

[7] When a jury renders its verdict:

> No motion challenging the sufficiency of the evidence as a matter of law to support a verdict. . .shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

Wis. Stat. § 805.14(1).

[8] The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable infer-

¶ 101. The majority's analysis is confusing. As a result, it is not clear what impact the court's decision will have on safety and discipline in Wisconsin schools. Because I do not believe that Douglas's story is "unquestionably" protected by the First Amendment or that this court has satisfactorily justified its reversal of Douglas's delinquency determination, I respectfully dissent.

## TRUE THREATS

¶ 102. This case is part of a trilogy of decisions in which the court has wrestled with the doctrine of "true threats." In *State v. Perkins*, 2001 WI 46, ¶ 29, 243 Wis. 2d 141, 626 N.W.2d 762, the court examines true threats in the context of a specific threat statute criminalizing "pure speech." *See* Wis. Stat. § 940.203(2). The court concludes that a true threat is determined using an objective reasonable person standard. "A true threat is a statement that a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression of a purpose to inflict harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views or other similarly protected speech." *Perkins*, 2001 WI 46 at ¶ 29. The court explains that it is not necessary that the speaker have the ability to carry out the threat and that, in evaluating whether a statement is a true threat, the court must consider the totality of the circumstances. *Id.* The court then lists *some* of the factors

ence can be drawn from the evidence, the inference which supports the finding is the one that must be adopted.

*State v. Poellinger*, 153 Wis. 2d, 493, 504, 451 N.W.2d 752 (1990) (quoting *Bautista v. State*, 53 Wis. 2d 218, 223, 191 N.W.2d 725 (1971)).

that may be considered in assessing both the threat itself and the relevant circumstances.

¶ 103. The second case, *In the Interest of A.S.*, 2001 WI 48, 243 Wis. 2d 173, 626 N.W.2d 712, and this third case attempt to apply the new true threat test to delinquency proceedings in which the alleged acts of delinquency are alleged violations of the disorderly conduct statute, Wis. Stat. § 947.01. In *A.S.*, the juvenile challenged his delinquency petition, arguing that the petition sought to punish protected speech and, in any event, his speech did not constitute a violation of the disorderly conduct statute. Here, Douglas challenged the constitutionality of the court's determination at trial that the product of his "creative writing" constituted disorderly conduct. The opinions in this case and *A.S.* are intended not only to flesh out the meaning of "true threats" but also to clarify when a true threat amounts to disorderly conduct under the statute.

¶ 104. The court's serious objective in this case does not yield a clear analysis. The majority opinion correctly dispatches the argument that speech cannot be prosecuted as disorderly conduct. Majority op. at ¶ 25. It eloquently concludes that "we cannot imagine how a student threatening a teacher [in the classroom] could not be deemed conduct that tends to menace, disrupt, or destroy public order." *Id.* at ¶ 28. But then it abandons this good work in an unpersuasive application of the law.

¶ 105. The majority faults the circuit judge for using the phrase "direct threat" several times, rather than the judicially-approved label of "true threat": "Assuming arguendo that the circuit court correctly found that Douglas's story is a 'threat' to Mrs. C," the majority writes, "this finding did not warrant the court

to make the logical jump to conclude that Douglas's story necessarily constitutes a 'true threat,' unprotected by the First Amendment." Majority op. at ¶ 30.

¶ 106.   In determining that Douglas's writing did not constitute a true threat, the majority must be saying that Douglas's story is *not* "a statement that a [writer] would reasonably foresee that a [reader] would reasonably interpret as a serious expression of a purpose to inflict harm, as distinguished from hyperbole, jest, innocuous talk, expressions of political views or other similarly protected speech." Unfortunately, the majority fails to explain with laser-like analysis how the circuit court went astray.

¶ 107.   According to this court's new test, the circuit court was expected to apply an objective reasonable person standard. It was also expected to put Douglas's story in the proper context and to consider the totality of the circumstances. Hence, looking backward, the question the circuit court faced was whether a speaker or writer in Douglas's position (a 13-year-old boy, already an adjudicated delinquent, who had clashed with his teacher about discipline matters in the past and who was angry because his teacher had sent him out into the hall during an English class) would reasonably foresee that a listener or reader in the teacher's position (a new teacher, beginning her first full year of teaching in a public school, in a national environment of apprehension about school violence, who is handed a crude piece of fiction that insults teachers, names and criticizes her thinly-veiled fictional equivalent, draws a parallel to a disciplinary incident in which the teacher was involved moments before, and then implies that the student will cut off her head with a machete because he is angry at her discipline) would reasonably interpret the writing as a

serious expression of a purpose to inflict harm (actual injury, intimidation, or fear of injury, thereby disrupting her emotional tranquility and her ability to teach in the classroom), as opposed to hyperbole and exaggeration or jest that would make a person smile at the student's imagination and cleverness.

¶ 108. It is quite wrong for this court to sift through the factual circumstances, minimizing the factors that are present and emphasizing factors that are not there. Douglas's story named "Mrs. C." The circuit court found that Mrs. C. and Mrs. [C.] were one in the same. Thus, the majority has no business referring to Mrs. [C.] as "the alleged victim of the threat." Majority op. at ¶ 37. Douglas handed the story directly to Mrs. [C.] and Mrs. [C.] became frightened. The direct communication is noteworthy. These facts are far more important than the fact that Douglas had apparently not threatened Mrs. [C.] in the past.

¶ 109. The majority argues that "there is no evidence that. . .Mrs. C believed Douglas had a propensity to engage in violence." Majority op. at ¶ 37. There is a very good chance, however, that Mrs. [C.]—at least after she talked with [the vice principal]—knew something of Douglas's troubles with the law, or that she had her own reasons for being afraid of him. These are reasonable inferences. The majority also errs in speculating that "Douglas could have expected another student to end his grisly tale as a dream or otherwise imagined event." Majority op. at ¶ 39. Attributing this high-minded motivation to Douglas is inconsistent with the circuit court's findings. Speculation of this sort is at odds with an appellate court's traditional methodology in reviewing a circuit court's findings of fact. We have repeatedly said that "we will not reverse the circuit court's findings of fact, that is, the underly-

ing findings of what happened, unless they are clearly erroneous." *State v. Pitsch*, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985); *see also State v. Smith*, 207 Wis. 2d 258, 266, 558 N.W.2d 379 (1997).

¶ 110.   The essence of the majority's opinion is that Douglas's story should be given First Amendment protection because it was a piece of fiction "in the context of a creative writing class." Majority op. at ¶ 39. The majority complains that the story does not contain language in which Douglas personally addresses a threat to Mrs. [C.].[9] Rather, it is written in the third person. Of course, in third-person fiction, the writer is not an actor; the writer stands apart manipulating the characters such as "Dick" and "Mrs. C." to do his bidding. The writer is thus capable of conveying a threat through the words and actions of his characters. Commentators have noted the importance of recognizing veiled threats in preventing school violence. *See* Kelly A. Zinna, *After Columbine: A Schoolplace Violence Prevention Manual* 56–57 (1999); John Nicoletti et al., *Violence Goes to School: Lessons Learned from Columbine* 42–44 (1999).

¶ 111.   The majority is also impressed by Douglas's hyperbole (beheading by machete instead of homicide by handgun) and his jest (Mrs. C. "stood for crab"). Majority op. at ¶ 39.[10] But the majority under-

---

[9] Once again, the story was handed directly to Mrs. [C.].

[10] There is a line between sarcasm and jest. They are not equivalent and may derive from substantially different motivations. In my view, it would not be clearly erroneous for a fact finder to conclude that a story about a student beheading a teacher with a machete as retribution for the teacher's discipline of the student was something other than "playful," "amusing," "frolicsome," or "witty," words normally associated with "jest."

mines its position by acknowledging that the result might have been different had Douglas penned the same story in a math class. It forgets that an English class is not the only place in school where a student can engage in creative writing, for example, in study hall, the library, or the cafeteria.

¶ 112. At first blush, Douglas's use of a machete rather than a gun appears to take his story into pure fiction. A machete attack is seemingly implausible. Inherent in the majority's analysis is the notion that the depiction of a machete in the story as opposed to a firearm is too "creative" to constitute a true threat. Unfortunately, the reality is that while this case was pending, a man attacked and injured nine people at a Winterstown, Pennsylvania school with a machete.[11] In November 1996, a 15-year-old student at Vancouver Technical Secondary School in British Columbia attacked a 14-year-old with a machete. The victim was slashed three times across the back and had nine tendons in his wrists severed as he tried to protect himself.[12] These are only two of a number of relatively recent machete incidents, several of which involved students.[13] The machete appears to be a particularly

[11] Peter Jackson, *Machete Attack at School Injures 3 Adults, 6 Children*, Pittsburgh Post-Gazette, Feb. 3, 2001, at A1.

[12] *See* Jim Hutchison, *Is Your Child Safe at School? at http://www.readersdigest.ca/mag/1997/09/think_01.html* (last visited Apr. 26, 2001).

[13] Numerous incidents in recent years in this country have involved machetes. *See* Charles A. Radin, *Anti-Gang Group Faces Growing Problems*, B. Globe, June 1, 1998, at C12 (youth severely injured in machete attack by gang members); Beth Daley, *Mass. Schools Pressed to Oust Unruly Students*, B. Globe, Jan. 6, 2000, at A1 (describing arrest of high school junior for accumulating weapons, including machete); Jennifer

Ackerman-Haywood & Lisa Johnson, *Teen Suspended for Machete in Car*, Grand Rapids Press, Apr. 12, 2000, at B2 (high school student suspended from school for carrying a machete in the trunk of his car); Denise Zoldan, *Weapons: Violence in Collier County's Schools*, Naples Daily News, July 25, 1999, *http://www.naplesnews.com/today/local/d232005a.htm* (last visited Apr. 26, 2001) (describing how a fifth-grade student threatened a third-grade student with a machete "because the third-grader called him fat"); Maria Elena Fernandez, *School Violence: 'We're Tired of Feeling Unsafe'; D.C. Teens, Others Question Security*, Wash. Post, May 5, 1998, at B1 (listing weapons confiscated in Washington, D.C. schools, including a machete); Peter Larsen, *Columbine High Shooting Conjures Memories of Close Call in O.C. School*, Orange County Reg., Apr. 26, 1999, at A14 (detailing foiled plot by three students to take their shop class hostage with a machete and two pistols); Ellen O'Brien, *'A Sense of Innocence was Lost' Jonesboro Buries Shooting Victims and Tries to Heal*, B. Globe, Mar. 28, 1998, at A1 (noting that boys who killed five people at Jonesboro in 1998 stockpiled weapons in a stolen van, including machetes); Jules Crittenden & Joe Chojnacki, *Columbine's Legacy Lingers; Schools Still Struggle to be Vigilant*, B. Herald, Feb. 6, 2000, at 22 (teen reported by fellow students for "love" of weapons, including machete with which he hit them); Diane Smith, *Irving Mother and Officials Grapple with Gang Shooting*, Fort Worth Star-Telegram, Sept. 7, 1997, at 1 (listing incidents of gang violence including a machete attack in which "a man's arms and back were severely hacked"); Tom Topousis, *Schools Chief Calls for War on Violence, Wants Statewide Campaign Against Escalating Assaults*, The Record (Northern New Jersey), Apr. 13, 1994, at A1 (citing teacher saying "she saw a student attacked repeatedly with a machete").

*See also* Daryl Nerl, *Liberty High Student is 6th Charged with Violence Threats*, Allentown Morning Call, June 6, 1998, at B6 (student threatens teacher, saying: "You know what's in my head, a machete to slice you up with."). According to the news

lurid weapon for inflicting injury.[14] In short, there is no reason to dismiss the seriousness of a threat merely because it involves use of a machete.

¶ 113.   In February 2000, a large group of people attended a meeting about school safety in Fort Gibson, Oklahoma, where four students had been shot in a violent incident two months earlier. A teenage student was called upon to demonstrate the problem of weapons at school. According to the newspaper report:

> The teen-ager standing on stage. . .in short sleeves and jeans looked like he had nothing to hide—until he pulled a knife from his pocket.
>
> And then came a machete. And another. He drew a handgun from a front pocket, and three more from his waistband. He reached down his baggy pants leg and up came a rifle.
>
> By the time Chris Dorn's pockets were empty, an arsenal lay before the high school sophomore. And the audience of school, police and emergency officials had a better idea of what they face in their efforts to keep schools safe.

Kelly Kurt, *Lesson in School Safety: Teen Produces Arsenal from Clothing*, The Daily Oklahoman, Feb. 23,

---

account, the student was charged by authorities with making a threat to the teacher. *Id.*

[14] In an article discussing the prevalence of weapons among today's youth, the author quoted numerous teens describing their personal choice in weapons. One teen said: "When I was growing up I used my fists. I had my first gun at nine or ten. My favorite was a .45—compact and with a kick that's unheard of. Then I packed machetes—three foot long. You haven't seen fear until you've pulled a machete on someone." Sandy Close, *Weapons of Choice on the Street—The Mouth, God, the Machete*, July 11, 1996, *at www.pacificnews.org/jinn/stories/2.14/960711-weapons. html* (last visited October 13, 2000, but article no longer accessible).

2000, at 8D. This news story dispels the notion that a student could not "conceal" a machete.

¶ 114. In *The School Shooter*, the National Center for the Analysis of Violent Crime discusses "leakage." "Leakage" occurs, according to the report, "when a student intentionally or unintentionally reveals clues to feelings, thoughts, fantasies, attitudes, or intentions that may signal an impending violent act." *The School Shooter, supra,* at 16.

> These clues can take the form of subtle threats, boasts, innuendoes, predictions, or ultimatums. They may be spoken or *conveyed in stories,* diary entries, essays, poems, letters, songs, drawings, doodles, tattoos, or videos.
>
> . . . .
>
> An example of leakage. . .could be recurrent themes of destruction or violence appearing in a student's writing or artwork. The themes may involve hatred, prejudice, death, dismemberment, mutilation of self or others, bleeding, use of excessively destructive weapons, homicide, or suicide. Many adolescents are fascinated with violence and the macabre, and writings and drawings on these themes can be a reflection of a harmless but rich and creative fantasy life.

*Id.* at 16–17 (emphasis added).[15]

¶ 115. Macabre writings may reflect a harmless fantasy life. Then again, they may be a true threat. The facts are best determined by fact-finders on the scene, not appellate judges.

---

[15] In *Commonwealth v. Milo M.,* 740 N.E.2d 967 (Mass. 2001), the Supreme Judicial Court of Massachusetts affirmed a determination of delinquency based upon a drawing that depicts a student pointing a gun at his teacher.

## FUTURE UNCERTAINTY

¶ 116. The majority concludes that Douglas's story, although "offensive and distasteful, unquestionably is protected by the First Amendment." Majority op. at ¶ 41. Having made this determination, the majority should provide reasonable guidance to school officials, law enforcement authorities, and the courts about how to deal with future threats in a school setting. For instance, if Douglas had written essentially the same story, including passages regarded as "jokes," but had "Dick" use a concealed Colt .45 caliber semi-automatic handgun to terminate Mrs. [C.], would the court have reached the same result? Suppose Douglas's story had unmistakably alluded to one or more of his eighth-grade classmates, making them Dick's target, in place of his teacher. Would the court have reached the same result? What makes the threat in *A.S.* a "true threat" as opposed to the threat here?

¶ 117. To reassure school authorities, the majority announces an important principle of constitutional law. It writes that the First Amendment prohibits law enforcement officials from prosecuting *protected* speech but does not prohibit school officials from disciplining the same *protected* speech. Majority op. at ¶ 42.[16]

¶ 118. The proposition that protected speech may lose its protection when uttered in a different context of time or place is well understood. The proposition that speech uttered in the exact same context—same speaker, same words, same time, same place—is fully protected by the First Amendment against some state action but not against other state action, is less estab-

---

[16] The scope of discipline here must contemplate suspension and expulsion from school.

lished. To give speech a dual character (protected/unprotected) depending upon who is seeking to punish it or how severe the punishment may be, will eliminate certainty in the law and create a chilling effect upon both speech and discipline.

¶ 119.   In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the Supreme Court stated that: "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506. At the same time, the Court emphasized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the school." *Id.* at 507.

¶ 120.   The Court distinguished the students' use of black armbands in *Tinker*—"direct, primary First Amendment rights akin to 'pure speech'"—from "aggressive, disruptive action." *Id.* at 508. The Court then stated:

> A student's rights. . .do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects. . .if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder

or invasion of the rights of others is, of course, *not immunized by the constitutional guarantee of freedom of speech.*

*Id.* at 512–13 (emphasis added) (citation omitted).

¶ 121. Since 1969, the Court appears to have stepped back somewhat from the position set out in *Tinker.* In *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 266 (1988), the Court said that the First Amendment rights of students in public schools " 'are not automatically coextensive with the rights of adults in other settings.' " *Hazelwood*, 484 U.S. at 266 (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)). They must be "applied in light of the special characteristics of the school environment." *Id.* (citing *Tinker*, 393 U.S. at 506). The Court said bluntly: "A school need not tolerate student speech that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Hazelwood*, 484 U.S. at 266 (citation omitted).

¶ 122. These Supreme Court decisions appear to draw a distinction between First Amendment rights *in public schools* and First Amendment rights elsewhere, implying that the First Amendment treats speech in public schools different from speech outside public schools because of the special educational environment in public schools.

¶ 123. The majority opinion asserts that some speech in public schools is protected from criminal prosecution but may be suppressed by rules and punished through internal school discipline. When? Are school officials expected to know the answer by instinct? The majority's untested thesis deserves authority and additional discussion.

## AN ALTERNATIVE ANALYSIS

¶ 124.  "The life of the law has not been logic: it has been experience."[17] With these words, Oliver Wendell Holmes, Jr. summed up his view that the law is not permanent, fixed, and unchangeable; rather, it evolves over time to reflect practices and events from the present and past. In an earlier article, Holmes wrote that, "The secret root from which the law draws all the juices of life," is in fact "considerations of what is expedient for the community."[18]

¶ 125.  Holmes appears to have applied his dynamic legal philosophy in *Schenck v. United States*, 249 U.S. 47 (1919), a case in which the Court sustained the conviction of two defendants for violations of the Espionage Act, in part for circulating printed leaflets urging young men to resist conscription. Holmes wrote for a unanimous Court:

> We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. *But the character of every act depends upon the circumstances in which it is done. . . .The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. . . .*The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in

---

[17] Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881) (based upon 1880 Lowell Lectures).

[18] Gary J. Aichele, *Oliver Wendell Holmes, Jr.: Soldier, Scholar, Judge* 111 (1989).

time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right.

*Id.* at 52 (emphasis added).

¶ 126.    In conceiving his memorable aphorism of the man falsely shouting "fire" in a theater, Holmes was writing in the shadow of sensational events. In December 1876, 295 people perished in a fire at a Brooklyn theater. In December 1881, 850 people died in a fire at a theater in Vienna. In December 1903, 602 people died at the Iroquois Theatre fire in Chicago. In January 1908, 170 people were killed in a fire at the Rhoads Theater in Boyertown, Pennsylvania.[19] Three years before the *Schenck* decision, the Tremont Theatre in Boston, Holmes's hometown, was burned.[20] A year before the *Schenck* decision, fire destroyed Dane Hall at Harvard University, where Holmes went to school.[21] Fires made up several of the gravest catastrophes in the nineteenth and early twentieth centuries. They were regarded with real fear. Moreover, news reports in 1917 and 1918 suggested that German terrorists and sympathizers were the source of an outbreak of serious fires in the United States after this country entered the war.[22] Holmes's theater aphorism,

---

[19] *See Fires: 1835–194 at http://www.swishweb.com/ Disasters/Fires/disaster01f.htm* (last visited Apr. 26, 2001).

[20] *Tremont Theatre Burned: Old Boston Playhouse and "Daddy Long-Legs" Suffer $75,000 Loss*, N.Y. Times, Jan. 24, 1916, at 12.

[21] *Students Risk Lives, Save Shells at Fire*, N.Y. Times, Feb. 4, 1918, at 6.

[22] *6 The N.Y. Times Index* No. 3, at 137 (1918); *6 The N.Y. Times Index* No. 2, at 143 (1918); *6 The N.Y. Times Index* No. 1, at 156–57 (1918); *5 The N.Y. Times Index* No. 4, at 139–41

then, appears to be an accurate reflection of contemporary concerns.

¶ 127.    Today our country is consumed by the outbreak of violence in public schools. Threats of violence in schools must be taken seriously.[23] Almost inevitably these threats produce fear among students and teachers. They inflict harm and impair the atmosphere for learning. Sometimes they create panic.[24] "Panic" is the

(1917); 5 *The N.Y. Times Index* No. 3, at 131 (1917); 5 *The N.Y. Times Index* No. 2, at 152 (1917); 5 *The N.Y. Times Index* No. 1, at 161–62 (1917).

[23] "In light of the violence prevalent in schools today, school officials are justified in taking very seriously student threats against faculty and students." *Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 372 (9th Cir. 1996).

[24] This court has previously recognized the epidemic of school violence and the panic that it can create in school officials, teachers, and students. *See In the Interest of Isiah B.*, 176 Wis. 2d 639, 650–51, 500 N.W.2d 637 (1993) ("Our holding is an example of adaptation of constitutional principles to a modern crisis. As noted by the Supreme Court in [*New Jersey v. T.L.O.*, 469 U.S. 325, (1985)], the presence of dangerous weapons in schools is a recent and extremely serious problem. On February 12, 1993, a Milwaukee Sentinel article indicated that 37% of male, Wisconsin high school students carry weapons. The article also indicated that '35% of the weapons. . .carried were guns, 49% knives or razors, [and] 16% clubs, bats[,]. . .pipes or other weapons.' "); *id.* at 651 (Abrahamson, C.J., concurring and dissenting) ("Safety in the schools is a matter of utmost concern and growing urgency. The facts of this case illustrate the very real dangers to which modern-day students are exposed and the serious obstacles school officials confront in keeping school environments safe and conducive to learning."); *id.* at 662 (Bablitch, J., concurring) ("The problems in our public schools have turned deadly, and students, teachers and administrators have real and justifiable fears concerning their schools. 'School children are inflicting violent harms upon each other at an alarming

word Justice Holmes used in *Schenck*. "Panic" is the reaction Mrs. [C.] described when she received Douglas's story. The potential for panic suggests an alternative analysis that the parties and the courts in this case have not explored.

¶ 128. Threats of violence against students, teachers, or administrators *in schools* "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). They "materially disrupt classwork," *Tinker*, 393 U.S. at 513, and therefore are not "immunized by the constitutional guarantee of freedom of speech." *Id.*

¶ 129. I am influenced in these views by society's reaction to terrorism and air piracy. No person should expect to benefit from a "true threat" analysis if he or she jokes at an airport about hijacking an airplane or carrying bombs or weapons onto a plane. See *United States v. Irving*, 509 F.2d 1325, 1329 (5th Cir. 1975), in which the court said: "The legislative history [of 49 U.S.C., Sec. 1472(m)(1)] makes clear that Congress was concerned with the prankster as well as with the individual acting out of malice, and has decreed that the conveyance of such false information is no joking matter."

¶ 130. Intentional bomb scares also fall outside protected speech. As the Supreme Court of Louisiana said in *State of Louisiana, In the Interest of R.T.*:

---

rate.' ") (citations omitted). Justice Bablitch's concurrence went on to cite numerous articles for the proposition that violence in schools is a major problem. *Id.* at 663 (Bablitch, J., concurring).

Words which by their very utterance may cause alarm, public disruption, or constitute a signal to prompt unlawful action fall within the principle of the false cry of "fire" in a crowded theater and are characterized as verbal acts unprotected by constitutional prohibitions against restraint of free speech. . . . We have no trouble concluding that the state has a legitimate interest in criminalizing apparently serious, albeit false, bomb threats, notwithstanding that the crime is committed through the medium of speech. The First Amendment does not protect criminal activity, even when carried out with words.

*In the Interest of RT.*, 781 So. 2d 1239, 2001 WL 170927 at 3 n.5 (La. 2001) (citation omitted).

¶ 131.   Because of the epidemic of violence in public schools, threats against students, teachers, and administrators in a school setting should not be afforded First Amendment protection. Based upon a "falsely shouting fire in a theatre" or "panic" analysis, school threats are incendiary per se. Whether these threats also violate some criminal statute depends upon the evidence in each situation.

## CONCLUSION

¶ 132.   Having carefully reviewed the facts and record in this case, I am persuaded that the circuit court's determination of delinquency should be affirmed. The two elements of disorderly conduct were proved beyond a reasonable doubt. Because the majority concludes otherwise, I respectfully dissent.