**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 17, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP2517**

Cir. Ct. No. **2024JV31**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

IN THE INTEREST OF I.T.S., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

I.T.S.,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Sheboygan County: ANGELA W. SUTKIEWICZ, Judge. *Affirmed*.

¶1    GROGAN, J.[1] I.T.S. ("Ira"),[2] appeals from a dispositional order entered following a bench trial wherein the court found Ira delinquent. On appeal, Ira argues the communications in question did not constitute a "true threat" for purposes of the First Amendment and that even if this court disagrees, the State failed to establish WIS. STAT. § 947.019(1)(e)'s remaining elements. Having reviewed the briefs and Record, this court concludes the communication constituted a "true threat" and that the State carried its burden of establishing § 947.019(1)(e)'s remaining elements. Accordingly, the circuit court did not err, and the dispositional order is affirmed.

## I. BACKGROUND

¶2    On March 8, 2024, the State filed a WIS. STAT. ch. 938 delinquency petition (the Petition) charging Ira, then 15 years old, with one count of making terrorist threats contrary to WIS. STAT. § 947.019(1)(e) (create risk of causing result). The following facts are taken from the Petition. On March 5, 2024, Ira was serving an in-school suspension after a teacher, Ms. P., discovered a nicotine "vape" in his possession that morning. That afternoon, while checking on Ira and assisting him with his work, Ms. P. observed multiple notes, one of which included the phrase "hit list" and identified multiple first names. The notes included other statements such as "Don't let the cops see this," "Don't open unless you got permission," "Me Dom kill trap goal, we got guns knifs," "plan to drop trap and spades on spring break when it's sumer," "Plan get ride to Sheboygan wi

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2] Ira is a pseudonym. *See* WIS. STAT. RULE 809.86. This court will also use initials for some individuals instead of full names to keep Ira's name confidential.

gun and kick door in and start a fight then pull gun out and shoot!!![,]" "7spade ido not know wtf to do with them bro but we need more guns me you [two individuals] everyone in the car[,]" and "iilegle writing don't let no teachers or cops or opps see this if you do you're a new opp!!"[3] Based on a prior unrelated incident involving Ira, the school resource officer (SRO) believed he was the "Trap" referenced in the notes.

¶3 A Deputy from the Sheboygan County Sheriff's Department was dispatched to the high school to investigate. Upon arrival, the Deputy first met with the SRO and the principal before speaking with Ira. According to the Petition, Ira told the Deputy "he was bored with being stuck in school suspension all day so he decided to create a fake plan" wherein he "pretend[ed] he was a police officer[,]" and he "stuck with" that explanation even after the Deputy "explained that did not make sense" because "having a hit list and talking about shooting people … would not be consistent with police officer's work."[4]

¶4 In April 2024, Ira filed a motion to dismiss alleging WIS. STAT. § 947.019(1)(e), as applied to him, violates the First Amendment's Free Speech Clause[5] and article I, section 3 of the Wisconsin Constitution.[6] Ira also argued the

---

[3] The spelling errors are reflective of the spelling errors contained in the notes.

[4] Per the Petition, the following day, the Deputy received an email from the SRO with information regarding text messages Ira had purportedly sent in January 2024 to one of the students named on the "hit list." One of those messages referenced an incident where the other student had apparently "look[ed] at" Ira and questioned whether the student was "trying to fight" with Ira. The student's mother also provided the SRO with information purportedly from Ira's social media account wherein there was "a video of someone holding a firearm out the window of a moving vehicle with their finger on the trigger." To the extent supporting evidence was not introduced at trial, this court does not consider it on appeal.

[5] *See* U.S. CONST. amend. I.

[6] Article I, section 3 provides:

(continued)

3

State had "failed to establish the first element of the charged petition, by not indicating facts to suggest that a threat was 'expressed' or communicated to any one person." *See* § 947.019(1)(e). According to Ira, the Petition failed to identify any conduct that would rise to the level of a "true threat" for First Amendment purposes under the totality of the circumstances, thereby rendering the alleged conduct forming the basis of the charge protected speech. Relying on cases such as *State v. Douglas D.*, 2001 WI 47, 243 Wis. 2d 204, 626 N.W.2d 725, and *State v. Perkins*, 2001 WI 46, 243 Wis. 2d 141, 626 N.W.2d 762, *abrogation recognized by Kindschy v. Aish*, 2024 WI 27, ¶14 n.9, 412 Wis. 2d 319, 8 N.W.3d 1, Ira generally asserted neither the Petition nor the evidence established any of "the alleged victims felt afraid by the threat, nor took any protective or preventative actions from the alleged threat" and "the victims did not have a reason to believe" Ira had "a propensity to engage in violence."[7] He also argued there was no showing, as required under *Counterman v. Colorado*, 600 U.S. 66, 79 (2023), that he had "consciously disregard[ed] the substantial and unjustifiable risk that the threat would cause harm to another." Thus, he said, in the absence of a "true threat," prosecution under § 947.019 was unconstitutional. Ira's motion to dismiss also asserted that because he "did not deliver, send, publish, or make known the contents of these writings to any of the victims nor any individuals"

---

> Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

[7] Ira also referenced the purported January 2024 text exchange and social media posts described in the Petition.

and because "[t]here was no intent for these writing to be given to anyone[,]" there was no "listener" for the purposes of § 947.019(1)(e).

¶5 The circuit court held a hearing on the motion. The State argued that although Ira was asking for dismissal based on "a freedom of speech argument," what Ira was actually saying was that the State cannot establish certain elements of the crime charged. The State believed proving the elements and whether the writings constituted a "true threat" were questions for trial. The court agreed, stating "that whether it's a true threat would be something that is a trial matter" and that based "on the face of the petition, it appears to be a true threat." It also rejected Ira's free speech argument because he had failed to "ma[ke] the argument as to how it is protected speech" and had not sufficiently "fleshed out" that argument. Accordingly, the court denied the motion to dismiss.

¶6 The matter proceeded to a bench trial in October 2024, where six witnesses testified—three on the State's behalf and three in Ira's defense. Ms. P., Ira's special education teacher and the individual who had discovered the writings, testified first. Ms. P. explained that on the morning of March 5th, another teacher had contacted her regarding Ira, whom she had been working with in a special education capacity for approximately six to seven months. After speaking to Ira in the hallway, Ms. P. "found a vape in his front pocket" and "brought him to the principal's office[,]" at which point the principal placed Ira in an in-school suspension.[8] When asked where Ira served the suspension, she described the room as being "a little room that holds just a desk right next to the principal's office."

---

[8] In his appellate brief, Ira seemingly suggests Ms. P. erred by reporting the vape to the principal and that if she instead had "simply confiscat[ed] the device and allow[ed Ira] to return to class" this matter could have been avoided entirely.

She also testified Ira did not have a backpack when he went into the suspension room and that she had provided him with eight-by-eleven-inch paper and a book.

¶7 Ms. P. confirmed she checked on Ira multiple times throughout the day and that it was during one of the afternoon check-ins that she discovered the writings, which ultimately led to the Petition being filed. Specifically, Ms. P. explained she had seen "a piece of paper that had been folded up and stapled around the edges" with writing "along the lines of -- do not show teachers or cops" and that the paper had been "sitting on the corner" of Ira's desk. Ms. P. said she asked Ira about the paper but that "he just, kind of, played it off," and therefore she "did not go any further with" it at that time and left. However, when she returned around 1:00 p.m. to assist Ira with an assignment, she noticed a drawing with "the letter I, a heart, and then a marijuana leaf" underneath his desk and "asked him to give [her] the whole stack of papers that were underneath his desk." While looking through those papers, she also discovered a drawing with a gun and knives.

¶8 After discovering the "I heart marijuana" drawing and the drawing with the gun and knives, Ms. P. discussed the inappropriateness of them with Ira and explained that "someone could see them and take that the wrong way or take it as a threat."[9] Ms. P. testified Ira "kind of, agreed with me that, 'Yeah, you're right. If someone did see that, that could be taken out of context.'" After continuing to help Ira with his math assessment, Ms. P. "happened to look up towards the ceiling" and saw "off the edge of the light … the corner of the piece of

_____

[9] According to Ms. P., the principal destroyed these specific documents after she turned them over to him.

paper." Ms. P. explained that after drawing Ira's attention to the paper, "he said, 'Yes, I didn't want you or [the principal] to see it.'" Ira retrieved the paper from the light at Ms. P.'s request.

¶9 Ms. P. went on to further describe the notes/drawings she had discovered. As for the paper that had been folded in a square on the corner of Ira's desk, she testified it had been stapled around the edges and that "what caught [her] attention" was the visible statement about "not show[ing] teachers or cops" and that it also said, "Don't open unless you got permission." The inside, she said, contained text stating, inter alia, "Plan to drop trap and Z spades on spring break," "Don't let no teachers or cops or O-P-P-S see this if you do, you're a new O-P-P," and "illegal writing." She also confirmed the note contained multiple spelling errors.[10]

¶10 Regarding the note discovered on the light, she explained it had also been folded into a square and stapled around the edges, but she did not recall seeing anything visible on the outside. The inside, however, contained the phrase "hit list" on the left side of the page. Underneath "hit list" the note contained a list of students' first names she recognized as attending the school. The page also had a list of names on the right side—not underneath the "hit list" column—that Ms. P. identified as the names of some of Ira's friends who did not attend the school at that time. When asked about additional details on the notes, Ms. P. described language stating "me dom kill trap goal," "we got guns knives," "plan get ride to

---

[10] The notes, which Ms. P. reviewed during her testimony, were marked as exhibits at the bench trial and admitted into evidence. This court has reviewed the notes, which contain multiple spelling errors, and this court generally uses the spelling reflected in the trial transcript rather than that of the notes themselves.

Sheboygan get gun and kick door in and start a fight then … pull gun out and shoot," "7spade I do not know w-t-f to do with them bro but we need more guns me you [two named individuals] everyone in the car," and "Don't trust L[] no more he is with trap working on a plan."

¶11 When asked what she had been thinking after discovering these notes, Ms. P. testified she "recall[ed] seeing hit list and then … immediately brought it to our high school principal because my understanding was, a threat is a threat, and I have to take everything seriously." She said she viewed it as a "[p]otential threat" because "[w]hen you see the word hit list -- especially these days -- in the school, again, you have to take that very seriously." Ms. P. also confirmed Ira was the only student who had been in the suspension room, that the drawings she discovered had not been in the room prior to Ira occupying the room, and that she did not observe Ira draw or write any of the notes.

¶12 The high school principal testified next and provided similar testimony regarding the notes' contents. In particular, he "vividly remember[ed]" that one of the notes said "hit list" followed by "three names that [he] recognized as potential students" at the school. He also recalled that the pages included statements to the effect of "Don't let any teachers see this, no cops see this, no opps see this," that there was a reference to not being able to trust another student identified in the note, and "a really clear description of what his intentions were with -- with driving to Sheboygan, knocking down a door, fighting, and then pulling out a gun and shooting."

¶13 The principal then explained that after initially reviewing the notes, he contacted the district superintendent and the school's SRO, confirmed Ira

remained in the in-school suspension room, and then contacted the county sheriff's department. When asked why he had taken these steps, he explained:

> This isn't a normal thing that comes across my desk, and so it [is] very alarming and a couple things right off the bat, you know, seeing student's names that I'm familiar with in -- in a form of a hit list; and then some other details that -- that I was very concerned with. That, and isolation would have forced me to call. I do have some history with the -- the student from previous situations that raised my level of concern even higher.

The principal also explained that because the list only identified students by their first names and multiple students shared some of those names, he reached out to the families of students whose names "could be on this list" to "ma[k]e them aware that there was a situation at school."

¶14    When questioned about whether Ira had made any comments to him about the notes, the principal explained Ira had "told [him] that it wasn't -- he didn't mean what he wrote[,]" but he confirmed he did not believe Ira because the principal recognized the names on the "hit list," those students were in Ira's grade, there was "a previous history of a situation" with Ira, and because of "the detailed plan[.]" When asked whether the school had been evacuated following Ms. P.'s discovery of the notes or whether school had been canceled, he confirmed it had not been.

¶15    The Deputy's testimony followed. She explained she had spoken with Ira at the school, Ira was aware of her reason for doing so, and Ira had informed her that he had created "a fake plan" and had been "pretending that he was a police officer" because "he was bored while in school suspension." The Deputy also confirmed she had spoken to some of the identified students and

families as well as that she had ultimately taken Ira into custody and had not found any weapons on Ira when she searched him.

¶16     Prior to calling his own witnesses, Ira's counsel reasserted the arguments from his pretrial motion to dismiss, arguing the State had failed to establish the notes in question amounted to a "true threat" for First Amendment purposes and that the purported threat had not actually been communicated. After hearing the parties' respective arguments, the circuit court denied the motion, stating:

> The Court would need to look at the totality of the circumstances and use some reasonable common sense here. We have a youth that is in in-school suspension, in a small room, given supplies by a teacher. He's not writing in a journal, or something to that effect. And he decides to use his time by making a hit list and making a specific plan, talking about weapons, what he's going to do as far as shooting people. And yes, that was stapled and shut, but it also said don't let cops or teachers look at it. It seems, perhaps, it could have been intended for co-actors he was going to share with it. It's also reasonable to think perhaps he was going to want that to be discovered, to place fear in people that he doesn't like.
>
> But the Court does know -- it has been established -- the listener doesn't have to be the recipient of the threats. So it does not seem to be something that he was going to keep to himself and not share. Once again, it does not seem to be something, like, just writing in a journal to express your thought to relay them to yourself. It seems like it was something to be shared, perhaps not with the people on the hit list, but the listener doesn't have to be the recipient of the threat. It's pretty hard to see what was written on these pages and not have a reasonable person interpret them as a true threat, especially with the fact that there was a specific plan.
>
> The youth's own words were that he was pretending to be law enforcement and that's why he did this -- that makes no sense at all. Just looking at -- as the Court said -- looking at all the factors and the circumstances here, especially what -- what the principal said having had some past history, having known about some interactions, he was

> very concerned and that's why he took the action that he did. And I don't know how a reasonable person could have a document like that, knowing that it could be easily discovered and not know that that would cause people to be very scared. That could not be interpreted as a true threat.

Ira then called three witnesses to testify on his behalf—the first two of whom were students whose names were included on the "hit list" and the third witness had been identified in the notes as not being trustworthy because he "is wit trap [potentially the SRO] working on a plan[]."

¶17 The first student witness testified he had not felt scared when law enforcement informed him about the "hit list," he had been told Ira was in custody, he would have felt safe even had Ira not been in custody, and he and Ira did not have a history aside from an incident a few weeks prior when he told Ira to "[p]ull up [his] pants" "[b]ecause he was sagging" and others could see his underwear. The second student witness likewise testified he "wouldn't say [he felt] scared" after learning his name was on the "hit list" but rather that he "was shocked" because he did not have a relationship with Ira and did not know why Ira would have included his name on the list.

¶18 The final student who testified on Ira's behalf—the student identified in Ira's notes as not being trustworthy—explained he knew Ira, they had mutual friends, and Ira is a cousin of his "best friend." Like the prior witness, this witness also described feeling "shocked" upon learning his name appeared in the notes but did not feel nervous about attending school the following day. Finally, the witness surmised that Ira may have been upset with him regarding a prior incident where he had reported to the SRO about Ira smoking a joint in the school bathroom and that "6roses," which appeared in the notes, referred to Roosevelt Park in Sheboygan.

11

¶19 Following the close of evidence and the parties' respective arguments, the circuit court concluded the State satisfied its burden of proof on the elements of the charge, and it found Ira delinquent. In doing so, the court commented at length:

> So when we look at the facts here, we have the youth in this very small room, in school suspension, with the one desk. He makes this hit list and other very scary statements. We know he's the author. He -- he gave statements. He said, "Well, this was a fake thing I was doing with police." Which didn't make any sense. He didn't deny writing it. I don't think we needed to have him searched, it was clear that he is the author of these documents.
>
> The documents are extremely concerning. It's a hit list with names of students -- a lot of it's difficult to -- for the Court to understand. I didn't know -- I see now it says, "6roses" -- we now know is a park. So some of it -- it's unclear, but I think any reasonable person would see this as very threatening and scary. And maybe 15-year-olds, because they didn't actually see a gun, or no one actually came to them, maybe because they know that he is in custody, they know law enforcement's involved; they don't particularly feel scared, they felt shocked.
>
> That wasn't -- those weren't all of the victims, those were two of the possible victims that had other people in the school with [the same] names. We didn't hear from [Frank[11]], who is the only person in the school with that name. Not sure if [the third student witness] was a victim or not. Perhaps the youth was very upset with [the third student witness] for turning him in to the SRO and that's why he wrote, "Don't trust [him]", but clearly the youth intended for someone to see this communication. It wasn't a diary, it wasn't written only for him, it's clear from looking at this, his plan of what he's going to do. "Get a ride to Sheboygan, kick door in, start a fight, pull gun out and shoot", and that's combined with the fact that his other documents that he had were drawing of a gun, and drawing of knives. And then we put this in with it, as well.

---

[11] Frank is a pseudonym.

12

So I'm not sure if the youth that are possibly named on the hit list, really understood how scary this was. I'm thinking that the parents probably did, because it is very scary to see your child's name on a hit list. As [the DA] said, sometimes people carry out what they have written, and that is certainly something that is scary. And when we look at whether it -- it caused panic or not, we had the teacher immediately seeing this and being concerned and going to the principal.

I don't think it's realistic to say the teacher should have done more, the teacher should have called law enforcement -- of course the teacher's going to go to the principal, that's what teachers do. As soon as she went to her principal, immediately the principal got law enforcement, the principal told the superintendent, the principal told the school resource officer. He saw this as an unreasonable and substantial risk. And I would agree with [the DA]; if he had done nothing or fluffed it off, there would be outrage. If something had actually happened -- perhaps if the youth wasn't taken into custody, if law enforcement wasn't called -- we don't know what would have happened, and I -- I think everyone would have questioned the principal. So I think the school did the right thing here, the teacher and the principal.

Clearly this was meant for it to be seen by others, clearly it was written by the -- the youth. There was really nothing in dispute there. And then as far as the true threat, I think [the DA] did a good job of going over the totality of the circumstances and all of the factors the Court has to consider; every one doesn't have to be met, but once again, I think the Court covered it, but just to look at the full context. Pictures of guns and knives that he drew, this list, the specific things that he was saying that would be done.

These are things that a reasonable person would be very concerned about. Very unsure exactly why he picked the juveniles that are on the list, but it doesn't matter; it just matters that these were threats. This was meant for someone; the teacher saw that, reported it to the principal and this is what we have. So the Court believes the State has met its burden, and the three elements have been met.

At a subsequent disposition hearing in March 2025, the circuit court placed Ira on supervision for one year with conditions, allowed for placement in his parents' home, and indicated Ira could petition the court for expungement if he

successfully completed his period of supervision. Ira appeals from the dispositional order.

## II. STANDARD OF REVIEW

¶20  This court will uphold the circuit court's factual findings so long as they were not clearly erroneous. *See, e.g.*, ***State v. Robinson***, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463; ***Lowe's Home Ctrs., LLC v. City of Delavan***, 2023 WI 8, ¶25, 405 Wis. 2d 616, 985 N.W.2d 69 (The circuit court's factual findings "will not be disturbed unless they are clearly erroneous. A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." (internal citation omitted)). "The weight and credibility to be given to testimony is uniquely within the province of the trial court." ***Noble v. Noble***, 2005 WI App 227, ¶16, 287 Wis. 2d 699, 706 N.W.2d 166. This court "independently appl[ies] constitutional principles to those facts." ***Robinson***, 327 Wis. 2d 302, ¶22; ***State v. A.S.***, 2001 WI 48, ¶¶18-19, 243 Wis. 2d 173, 626 N.W.2d 712.

¶21  "[I]n reviewing the sufficiency of the evidence," "appellate court[s] may not substitute [their] judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." ***State v. Poellinger***, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). "If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it." ***Id.***

## III. DISCUSSION

¶22  The issue presented requires this court to determine whether the writings at issue constitute a "true threat" for purposes of the First Amendment, and if so, whether the State also established the remaining elements of WIS. STAT. § 947.019(1)(e).

¶23  On appeal, Ira challenges the circuit court's conclusion that the writings in question constitute a "true threat" under the First Amendment—a requirement for establishing a violation of WIS. STAT. § 947.019(1)(e).  In arguing that the totality of the circumstances confirms no "true threat" existed, Ira focuses largely on his position that the evidence failed to establish that he either delivered or intended to deliver the notes in question.  For support, he points to the fact that he drafted these notes "while confined in a secluded place that had room for only one student[,]" he had folded and stapled the notes to prevent others from seeing their contents, that one of the notes indicated permission was required before viewing, and he had attempted to conceal one on a light or in the ceiling of the in-school suspension room.  Ira also asserts the State failed to establish the "writings conveyed 'a real possibility that violence will follow'" because Ms. P. had described it as only a "'potential' threat," because he believed the principal's testimony established his actions were "partially motivated by pragmatic administrative concerns[] such as getting out in front of any rumors and making sure his bosses heard about the situation from him first" as opposed to believing something nefarious was actually afoot, and because the student witnesses whose names appeared on the notes were not scared when they learned of the "hit list."

¶24  Regarding the remaining totality of the circumstances considerations, Ira argues that the fact the notes "lack grammatical structure, are

littered with misspellings and rife with an impenetrable slang perhaps known only to [himself], and are rendered in a childlike, hard-to-decipher, writing" all weigh against a conclusion that they clearly signaled he had any real plan for violence. He further contends the State failed to establish: (1) a clear "intent to communicate these alleged threats to anyone"; and (2) that Ira had previously "made any similar threats" to the named students or that the identified students "had reason to believe [Ira] had a propensity for violence." Ira also asserts the State failed to present evidence establishing he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *See* WIS. STAT. § 947.019(1)(e); WIS-JI—CRIMINAL 1925B. This is so, he says, because the evidence does not support a conclusion that he acted recklessly, which would require evidence that he understood others might view the writings as threats.

¶25 Finally, Ira argues the State failed to establish he had "create[d] an unreasonable and substantial risk of … causing public panic or fear[,]" *see* WIS-JI—CRIMINAL 1925B, because Ira's notes "were simply too ambiguous and childlike to have been taken sufficiently seriously to create a reasonable probability of panic or fear," and the State did not establish Ira was aware of any risk of the impact his notes might have on others.

¶26 The State challenges Ira's contention that it failed to establish the writings amounted to "true threats" and that it had likewise failed to establish the remaining elements under WIS. STAT. § 947.019(1)(e). It says the totality of the circumstances establish this was a "true threat" because: (1) there was no justifiable or otherwise innocent context for Ira's having written the notes, which it said distinguished this case from **Douglas D.**, 243 Wis. 2d 204; (2) the names on the "hit list," despite being only first names, were nevertheless the names of students attending the same high school and who Ira would have had contact with;

16

(3) unlike in **Douglas D.**, where the challenged writings were drafted by more than one person, Ira alone had drafted the notes in question here; (4) Ms. P. immediately reported the notes to the principal, who thereafter contacted the superintendent, SRO, and sheriff's department; (5) it was clear Ira intended *someone* to view the notes; and (6) the notes included a plan. The State further argues the notes "created an unreasonable and substantial risk of causing panic or fear" given their contents, recitation of a "hit list," and plans referencing guns and killing—particularly in light of the current environment regarding school violence—and that Ira was aware of such risk given the references to not allowing law enforcement or teachers to view them.[12]

¶27     WISCONSIN STAT. § 947.019 provides that "[w]hoever, under any of the following circumstances, threatens to cause the death of or bodily harm to any person or to damage any person's property is guilty of a Class I felony":

> **(a)** The actor intends to prevent the occupation of or cause the evacuation of a building, dwelling, school premises, vehicle, facility of public transportation, or place of public assembly or any room within a building, dwelling, or school premises.
>
> **(b)** The actor intends to cause public inconvenience.
>
> **(c)** The actor intends to cause public panic or fear.
>
> **(d)** The actor intends to cause an interruption or impairment of governmental operations or public communication, of transportation, or of a supply of water, gas, or other public service.

---

[12] In his Reply brief, Ira faults the State for failing to acknowledge **State v. A.N.G.**, No. 2019AP1100, unpublished slip op. (WI App May 21, 2020), which Ira had drawn analogies to in his moving brief. **A.N.G.** is an unpublished opinion citable only for its persuasive value, and regardless of whether the State attempted to distinguish that case or not, **A.N.G.** is not binding on this court. *See* WIS. STAT. RULE 809.23(3)(b).

**(e)** The actor creates an unreasonable and substantial risk of causing a result described in par. (a), (b), (c), or (d) and is aware of that risk.

Sec. 947.019(1). Thus, to establish a violation of § 947.019(1)(e), the charge alleged in the Petition, the State must establish Ira: (1) "threaten[ed] to cause the death of or bodily harm to any person or to a person's property"; (2) "creat[ed] an unreasonable and substantial risk of" any of the circumstances set forth in § 947.019(1)(a)-(d); and (3) "[was] aware of that risk." *See* WIS-JI—CRIMINAL 1925B; § 947.019(1)(e). For purposes of the first element—a threat to cause death or bodily harm—the State must establish the threat was a "true threat" not protected by the First Amendment's free speech clause.[13] *See, e.g.*, WIS-JI— CRIMINAL 1925B; *Counterman*, 600 U.S. 66; *Kindschy*, 412 Wis. 2d 319.

¶28 This court has reviewed the Record and arguments presented on appeal and concludes both that the circuit court's factual findings were not clearly erroneous and that it correctly concluded the State established each of WIS. STAT. § 947.019(1)(e)'s requirements.

---

[13] The jury instruction includes the following explanation of what constitutes a "threat" under WIS. STAT. § 947.019(1)'s first element:

A "threat" is an expression of intention to do harm and may be communicated orally, in writing, or by conduct. This requires a true threat. "True threat" means that a reasonable person would interpret the threat as a serious expression of intent to do harm, and the person making the statement is aware that others could regard the statement as threatening violence and delivers it anyway. It is not necessary that the person making the threat have the ability to carry out the threat. You must consider all the circumstances in determining whether a threat is a true threat.

WIS-JI—CRIMINAL 1925B. Wisconsin's jury instructions provide persuasive authority for interpreting statutes. *See State v. Rardon*, 185 Wis. 2d 701, 706, 518 N.W.2d 330 (Ct. App. 1994).

¶29    As set forth above, to prove a violation of WIS. STAT. § 947.019(1)(e), the State must first establish the existence of a "true threat." "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman*, 600 U.S. at 74 (alteration in original; citation omitted). "The 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow[.]" *Id.* "Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat[.]" *Id.*

¶30    "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Id.* (citation omitted). "True threats subject individuals to 'fear of violence' and to the many kinds of 'disruption that fear engenders.'" *Id.* (citation omitted). Thus, "whether a statement is a true threat does not require an inquiry into the speaker's subjective mindset." *Kindschy*, 412 Wis. 2d 319, ¶14. However, while "the test for whether a statement is a true threat is objective," "before a person may be criminally convicted for making a true threat, the First Amendment requires proof of the speaker's subjective intent." *Id.*, ¶15. Thus, "proof that the speaker acted at least recklessly is required." *Id.* "Recklessness in this context means that the speaker 'consciously disregarded a substantial risk that his communications would be viewed as threatening violence.'" *Id.* (quoting *Counterman*, 600 U.S. at 79).

¶31    Our supreme court has previously counseled that courts are to consider the totality of the circumstances in determining the existence of a "true threat." *See, e.g.*, *Perkins*, 243 Wis. 2d 141, ¶¶30-31; *Douglas D.*, 243 Wis. 2d 204, ¶¶33-34. Our supreme court has identified multiple factors a court should consider when addressing the totality of the circumstances:

19

> [H]ow the recipient and other listeners reacted to the alleged threat, whether the threat was conditional, whether [the threat] was communicated directly to its victim, whether the maker of the threat had made similar statements to the victim on other occasions, and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence.

*Douglas D.*, 243 Wis. 2d 204, ¶34 (second alteration in original; footnote omitted; citation omitted). This list is non-exhaustive. *Id.*

¶32 In addressing whether the notes in question amount to a "true threat," the circuit court engaged in a lengthy totality of the circumstances analysis, which is set forth in large part above. This court agrees with that analysis and adopts it as a part of its own analysis. First, in regard to how the recipient and listeners reacted, the evidence establishes that Ms. P. and the principal, the first individuals to see the notes, took Ira's notes seriously. They believed the notes contained true threats because they contained a "hit list" identifying names of students who attended the school and because they also referenced guns and plans to kill. The Deputy likewise took the notes seriously, as indicated by the fact that she ultimately took him into custody. Although the students named in the notes apparently did not appear to be scared, as the circuit court aptly observed, 15-year-old students may have a sense of bravado, particularly given that they were aware Ira had been taken into custody and that law enforcement was investigating the matter. It does not appear that Ira had made similar threats to the students named in the note previously or that the named students had reason to believe Ira might actually engage in violence. However, the principal testified, albeit vaguely, that due to a prior incident involving Ira, he did have concerns.

¶33     This court also disagrees with Ira's repeated protestations—both pretrial, at trial, and on appeal—that he did not "deliver" the notes within the meaning of the "true threats" analysis.  Rather, those communications were, as the circuit court concluded, clearly intended to be seen by someone.  And, although the outside of one of the stapled notes reflected it should not be opened without permission, the mere suggestion that permission could be obtained indicates Ira did not intend to keep the note private, but rather that he intended someone to view its contents.  These were not writings in a private journal or diary, and at least one of the notes was out in the open on Ira's desk.  To the extent the notes suggest potential co-actors, that too, as the circuit court suggested, could reasonably be construed as an intention to share these notes with others.  Taken as a whole, the circuit court's factual finding that this was not a private writing is not clearly erroneous.

¶34     There is also no question that a reasonable listener would construe these as being a "serious expression of intent to do harm."  *See* WIS-JI—CRIMINAL 1925B.  Ira was serving an in-school suspension at the time these notes were drafted and discovered.  In today's society, where mass shootings and gun violence are far too common—particularly in our schools—a note stating it is a "hit list" identifying the names of students currently attending the school and known to the writer would certainly cause grave concern, particularly when discovered in the school itself.  *See, e.g.*, ***Douglas D.***, 243 Wis. 2d 204, ¶28. While this court does not suggest that discovering such communications in the school setting alone is sufficient in and of itself to establish that a threat is a "true threat" under the First Amendment, it is certainly a factor worthy of consideration under the totality of the circumstances—and it is a factor that undoubtedly weighs on how the recipient or listener may construe the threat.

21

¶35 Finally, this court is also satisfied that the Record sufficiently establishes that Ira was aware of the concerns these notes would cause. Ms. P. testified she had discussed the inappropriateness of other drawings discovered during his in-school suspension—the drawing with a picture of a heart and marijuana leaf and the drawing with guns and knives—and that Ira had acknowledged such drawings could cause concern. His understanding that others could perceive those drawings as threats clearly indicates he likewise understood that a "hit list" note would likewise cause concern, particularly in light of the other notes that discussed guns and killing. Additionally, the text on the outside of one note indicating that "cops" should not be allowed to see it similarly suggests Ira realized the note would undoubtedly give cause for alarm and that law enforcement would take it seriously, particularly given that the notes were discovered within a school. This is a reasonable inference. And finally, as the State points out, Ira folded the notes and indicated they should be hidden from teachers and law enforcement, which also reasonably suggests Ira understood that others—particularly the very teachers and law enforcement from whom he wished to conceal the communications—would take them seriously.[14] In light of the foregoing, this court concludes the notes in question constitute a "true threat" for First Amendment purposes. There is sufficient evidence to reasonably infer these were true threats not protected by the First Amendment.

---

[14] The Record contains references to a prior similar incident involving Ira; however, the details related to that incident are sparse. This court notes that court reports and transcripts in the Record indicate that the current matter was the second time a petition had been filed alleging Ira had engaged in terrorist threats, with the prior matter (which reports indicate would be dismissed) allegedly having occurred in early December 2023. It is not entirely clear whether that prior matter is the matter the principal referred to in his testimony.

¶36 Turning to the two remaining factors the State must establish pursuant to WIS. STAT. § 947.019(1)(e)—that Ira "create[d] an unreasonable and substantial risk of causing a result described in par. (a), (b), (c), or (d)" and that Ira was aware of that risk (e.g., that he was reckless)—this court readily concludes the State carried its burden. The notes in question were discovered while Ira was at school, the notes contained a "hit list" that included names of current students at the school, and the notes made multiple references to weapons, violence, and killing. Such threats could lead to an evacuation of school premises or the cancellation of classes—although that ultimately did not occur here. *See* § 947.019(1)(a). Likewise, such communications can easily be construed as "caus[ing] public panic or fear." *See* § 947.019(1)(c). Again, this is especially true in light of the relative frequency with which violence occurs in our schools and in our society. Finally, as stated above, the evidence establishes Ira was aware of the risk these notes were likely to cause these reactions and results. The fact that he drafted these notes while in an in-school suspension, despite understanding the impact they would have, certainly satisfies the recklessness requirement. *See* ***Kindschy***, 412 Wis. 2d 319, ¶15 ("Recklessness in this context means that the speaker 'consciously disregarded a substantial risk that his communications would be viewed as threatening violence.'" (quoting ***Counterman***, 600 U.S. at 79)).

¶37 In summary, this court concludes the notes in question constituted a "true threat," and because the circuit court's conclusion that the State had established all necessary elements required to sustain a conviction under WIS. STAT. § 947.019(1)(e) was not erroneous, it likewise did not err in denying Ira's motion to dismiss following the close of the State's evidence at trial.

*By the Court.*—Order affirmed.

23

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.